**Dale B. MENARD, Plaintiff,**

v.

**John MITCHELL et al., Defendants.**

**Civ. A. No. 39–68.**

United States District Court,
District of Columbia.

June 15, 1971.

R. Raymond Twohig, Jr., Georgetown Legal Intern Program, Washington, D. C., for plaintiff.

Joseph Hannon, Asst. U. S. Atty., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

Plaintiff has brought this action to expunge his arrest record contained in the Fingerprint Identification files of the Federal Bureau of Investigation. That record reads as follows:

Date arrested or received: 8/10/65

Charge or offense: 459 PC Burglary

Disposition or sentence: 8/12/65 Unable to connect with any felony or misdemeanor—in accordance with 849b(1)—not deemed an arrest but detention only.

Occupation: student

Originally the matter was presented to another Judge of this Court on cross-motions for summary judgment and defendants prevailed. The Court of Appeals reversed and remanded for the taking of testimony after expressing interest and concern with issues suggested by the pleadings which the Court apparently felt had not been fully developed in the record. Menard v. Mitchell, 139 U.S.App.D.C. 113, 430 F.2d 486 (1970). Accordingly, further evidence was taken at a full hearing and the issues have been briefed and argued.

Menard, age 19 at time of arrest and subsequently an officer in the Marine Corps, contends that his arrest in Los Angeles was without probable cause and that future dissemination of the above arrest record, now in the files of the FBI, may impede his employment op-portunities and subject him to an increased risk of being suspected and arrested for crimes on other occasions. He seeks expungement of the record or, in the alternative, strict limitations on its dissemination by the FBI.

Before considering the merits of the expungement issue raised, it is appropriate to set forth complete findings on two subjects indicated by the Court of Appeals as matters for particular inquiry on remand: the procedures and practices of the FBI with respect to maintaining arrest records and the circumstances of Menard's arrest.

### I. The Procedures of the FBI Identification Division

Fingerprint and arrest records such as Menard's are under the jurisdiction of the Federal Bureau of Investigation's Identification Division. This Division, which has been in existence since 1924, functions under the Attorney General, and proceeds by authority of 28 U.S.C. § 534, which reads as follows:

§ 534. Acquisition, preservation, and exchange of identification records; appointment of officials

(a) The Attorney General shall—

(1) acquire, collect, classify, and preserve identification, criminal identification, crime and other records; and

(2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.

(b) The exchange of records authorized by subsection (a) (2) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies.

(c) The Attorney General may appoint officials to perform the functions authorized by this section. Added. Pub.L. 89–554, § 4(c), Sept. 6, 1966, 80 Stat. 616.

The Attorney General has made a series of rulings interpreting the stat-

ute. These are largely codified in 28 C.F.R. § 0.85(b) which provides that the Director of the FBI shall:

Conduct the acquisition, collection, exchange, classification, and preservation of identification records, including personal fingerprints voluntarily submitted, on a mutually beneficial basis, from law enforcement and other governmental agencies, insurance companies, railroad police, national banks, member banks of the Federal Reserve System, FDIC-Reserve-Insured Banks, and banking institutions insured by the Federal Savings and Loan Insurance Corporation; provide expert testimony in Federal or local courts as to fingerprint examinations; and provide identification assistance in disasters and in missing persons type cases including those from insurance companies.

The FBI Identification Division has some two hundred million sets of fingerprints on file. These records are maintained in separate criminal and applicant files. Fingerprints are submitted to the Bureau by federal, state, and local agencies on a reciprocal basis. Law enforcing agencies, primarily local police and sheriff's offices, submit prints of arrested persons in order to receive information on the person's prior criminal involvement. The Bureau reports its findings and maintains the fingerprint card so submitted, along with the occompanying arrest data, in its criminal file. Information on the subsequent disposition of each arrest is posted if received from the submitting agency. The information so recorded is cryptic and formal, without explanation or elaboration. Juvenile arrests and convictions, when submitted by local agencies, are treated the same as similar adult data. The criminal file currently contains information on some sixty million arrests of approximately nineteen million people.

Fingerprint cards are also received from agencies of the state and federal governments and others who seek information on an individual's record of criminal involvement in connection with permits, licenses, and employment clearance. After check against the criminal file, these cards are maintained in the applicant file for future reference. The Division also receives hundreds of "name check" requests from contributing and non-contributing sources, including an occasional Congressman, asking for the criminal record of an individual by name without submitting any fingerprints for comparison. Many of these cannot be processed because of inadequate identification of the person named, particularly where common names are involved. Where possible, however, and where the inquiring agency gives what the FBI considers a legitimate reason for the request, these inquiries are processed.

The volume of work of the Division is enormous, requiring about 3,300 employees. The Division receives an average of 29,000 fingerprints a day for processing, of which about 13,000 are received from law enforcing agencies in connection with arrests.

The Division, broadly speaking, considers any state, city or county official to be authorized to receive information if the agency has something to do with law enforcement or if it is authorized by statute, ordinance, or rule to fingerprint applicants for employment or for a permit or license. The laws and ordinances of various local areas vary widely. Some areas do not require fingerprinting for practically any purpose while others have highly detailed fingerprinting requirements for varied and often quite minor occupations. Examples are listed in Appendix A. The record contains a long list of state and local governments and a large number of different licensing authorities who by law or regulation are required to take fingerprints as part of their licensing duties. The Division maintains a current list of contributing or participating state and federal agencies which now numbers between 7,000 and 8,000. Of these, approximately 3,750 are local police depart-

ments and sheriff offices. Criminal record data is not sent directly to private employers, except in a few instances such as 390 banks insured by the F.D.I.C. and certain hospitals.[1]

As far as the Federal agencies are concerned, Executive Order 10450 of April 1953, 3 C.F.R. 936 (1949–53 Comp.), 5 U.S.C. § 7311, requires a check of the FBI fingerprint files on practically all applicants for employment in the Federal Government whether or not engaged in law enforcement. The Civil Service Commission and the Military account for the highest volume of fingerprints submitted to the Bureau.

Given the very general nature of its purported authority the Bureau has proceeded cautiously. It investigates the authority of local agencies to require fingerprints and insists that detailed forms be filled out by contributors showing the purpose for which fingerprints are to be submitted. The Attorney General advises in doubtful situations. The Division has carried out its work in a responsible, meticulous manner. Nonetheless, the end result is most unsatisfactory. While the Division has vigorously sought to develop complete records and particularly to learn of dispositions resulting from each arrest, this effort has not been successful due to the failure of arresting agencies to send in follow-up data on forms provided. Some police departments do much better than others in this regard, but the Division has no sanctions and must be satisfied with what it can get by persuasion since the whole system functions on a voluntary basis. Even more troublesome is the fact that the Division has little opportunity to supervise what is actually done with the arrest records it disseminates. It requires that a proper purpose be stated by the agency requesting information but what is in fact done with the information as a practical matter cannot be constantly checked. It is apparent that local agencies may on occasion pass on arrest information to private employers. The Division makes no regular inspection to prevent this, for it has neither funds nor sanctions, and accordingly responds only to complaints. In a few instances police departments have been restricted, and in other instances when complaints were received personnel or administrative changes were demanded by the FBI and put into effect.

The FBI does not supply an individual with his arrest record except under rare special circumstances. The reasons are apparently two: the difficulty of obtaining definite identification of the person requesting the record, and fiscal considerations. There is no sure procedure for finding an arrest record by name only. A clear set of fingerprints is required for matching purposes. Thus as a practical matter an individual must submit his prints to get a check made of his record. This is cumbersome. Moreover, the Division is already so hard-pressed that it cannot now meet the demands on it from all local agencies. A regular system of servicing individuals requesting their personal arrest records would require an estimated $110,000 per annum, plus appropriations for at least six additional employees.

Any agency that forward fingerprint arrest data to the Division may request the Bureau to remove the data from the file and return it. This the Bureau does automatically, retaining no copies and without inquiring as to the reasons underlying the request. Thus control of what arrest or criminal data remain in the files rests in every case (except where an arrest on Federal charges is involved) with the local arresting authority. In 1970 over 8,000 arrest records were returned by the FBI to local authorities. Some thirteen states, including California, have laws or procedures for authorizing this form of expungement in varying circumstances. In addition some states have laws limiting the type of

---

[1]. Insurance companies are aided in necessary identification work but are not furnished criminal record data by the FBI.

arrest data that can be forwarded routinely to the Bureau.

Against this background, which was more fully developed in the record in an effort to supply the type of data requested in the decision of the Court of Appeals, it is possible to turn to the issues presented by this particular lawsuit.

## II. The Circumstances of the Arrest

█ Menard was arrested on suspicion of burglary by two officers of the Los Angeles Police Department. The arrest occurred around 4:00 a. m. on August 10, 1965. The police had earlier that morning received a complaint of a prowler at a sanatorium located in a high crime area. The prowler was reported looking in windows and at the back parking lot of the institution. Checking on this complaint, the police obtained a description of the man and proceeded to patrol the area. A short distance away they saw an unkempt, unshaven man fitting the description, dressed in dark clothing lying on a park bench. That man was Menard. Near him on the ground was a wallet belonging to someone else containing $10. The officers had reason to believe the wallet might have been discarded by Menard as he observed the officers approaching him through the park. The arrest was made without knowledge of any specific burglary[2] but on the basis of the prowler complaint, the suspicious presence of the wallet, and the general circumstances outlined above. Menard's arrest was with probable cause. Ker v. California, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 10 L. Ed.2d 726 (1963); Jackson v. United States, 112 U.S.App.D.C. 260, 302 F. 2d 194, 196 (1962); People v. Fischer, 49 Cal.2d 442, 317 P.2d 967, 970 (1957).

Menard was booked at the precinct after the Watch Commander reviewed the facts and circumstances reported by the officers. He was fingerprinted and his prints with a notation of his arrest were sent to the Bureau in accordance with regular procedures. After further investigation, Menard was released in accordance with the provisions of the California Penal Code, the police being "unable to connect with any felony or misdemeanor at this time." Plaintiff and his family then sought by lengthy correspondence with the Los Angeles Police Department to have the record expunged by the Police Department but were finally advised on May 31, 1966, that removal of the record would be possible "only upon order of a court of competent jurisdiction." This was confirmed by correspondence with the Bureau which took the position that the Bureau had no authority to determine what fingerprints should be in the FBI files.

## III. Expungement

The Government argues persuasively that a district court is without authority to make a determination of probable cause where a state arrest is concerned, and that in any event the Court should in such cases exercise its discretion and not intervene, leaving Menard to pursue his expungement remedies in the California state courts. There is substantial authority and much common sense supporting this position.

The FBI simply records in its files information supplied by other agencies, and is in no position to make an independent investigation of the circumstances of an individual's arrest by state authorities or later developments in his case. Nor is a Federal District Court in a position to litigate the merits of arrests made by state authorities far away from its jurisdiction, as the problems of proof in this case demonstrate. The Bureau uniformly honors requests by contributing agencies that a record be removed from the FBI files and returned to the agency. Whatever the issue as to the legality of an arrest record, an action for its expungement

2. Burglary is defined under the California Penal Code § 13–459 as follows:

Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building * * * with intent to commit grand or petit larceny or any felony is guilty of burglary.

cannot be maintained unless administrative remedies are first exhausted; and where these efforts are unsuccessful, as were Menard's, resort should be had in the first instance to the state courts. This procedure is strongly suggested if not compelled by recent cases which hold that federal courts should refrain from interfering with a state's administration of its own criminal laws, and should abstain from deciding issues of local concern until they are first presented to the state courts. *See, e. g.,* Younger v. Harris, 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Fay v. Noia, 372 U.S. 391, 417–420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Buechold v. Ortiz, 401 F.2d 371, 373 (9th Cir. 1968); Ganger v. Peyton, 379 F.2d 709, 710 (4th Cir. 1967). The fact that the Court has made the factual determination of probable cause in this case arises solely from the specific directions given on the remand and should be no precedent for the future.

The Court of Appeals apparently felt that a finding of probable cause was relevant to a determination of the question whether Menard's arrest record is a "criminal record" of the type which the Bureau is authorized to maintain under 28 U.S.C. § 534. Analysis demonstrates, however, that the question of probable cause has little to do with the merits of the underlying controversy. An arrest whether made with or without probable cause is to be sure a fact, but one that proves nothing so far as the actual conduct of the person arrested is concerned. An arrest without probable cause may still lead to conviction and one with probable cause may still result in acquittal. Under our system of criminal justice, only a conviction carries legal significance as to a person's involvement in criminal behavior. As the Supreme Court stated in Schware v. Board of Bar Examiners, 353 U.S. 232, 241, 77 S.Ct. 752, 757, 1 L.Ed.2d 796 (1957):

> · The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated. [Footnote omitted.]

Other cases have held that arrests without convictions may not legally be used as the basis for adverse action against an individual. In Gregory v. Litton Systems, Inc., 316 F.Supp. 401 (C.D. Cal.1970), the practice of an employer in denying employment to persons with arrest records was found to violate Title VII of the Civil Rights Act of 1964. The court made factual findings that such a practice disqualified a higher proportion of blacks than whites, and that "information concerning a prospective employee's record of arrests without convictions, is irrelevant to his suitability or qualification for employment." 316 F.Supp. 401, 403. *See also* United States v. Kalish, 271 F.Supp. 968, 970 (D. Puerto Rico 1967).

Relying on these general principles, Menard argues that in the absence of a conviction, the maintenance and use of his arrest record for any purpose whatsoever violates several constitutional guarantees—the presumption of innocence, due process, the right to privacy, and the freedom from unreasonable search under the Fourth Amendment. There are few precedents which deal directly with these issues. Those that do exist usually involve special circumstances such as dragnet arrests or arrests under patently unconstitutional statutes. *See, e. g.,* Wheeler v. Goodman, 306 F.Supp. 58 (W.D.N.C.1969); Hughes v. Rizzo, 282 F.Supp. 881 (E.D. Pa.1968). Others have granted relief on motion ancillary to a pending criminal proceeding, calling upon general equity principles or local rules rather than constitutional considerations. *See, e. g.,* Morrow v. District of Columbia, 135 U.S. App.D.C. 160, 417 F.2d 728 (1969); United States v. Kalish, 271 F.Supp. 968

(D. Puerto Rico 1967); Irani v. District of Columbia, 272 A.2d 849 (D.C.App. Jan. 27, 1971).

Each of Menard's constitutional arguments makes certain assumptions about the uses to which his arrest record will be put. As the Court of Appeals noted, it is a fact subject to ready judicial notice that dissemination of an arrest record may place substantial obstacles in the way of a person's opportunity for employment or advancement, and may also affect aspects of law enforcement and judicial action. No court has yet examined the legality of FBI practices with respect to the dissemination of arrest records. It is appropriate, therefore, to deal fully with those issues before reaching any expungement claims. The Court is required to determine under what circumstances, if any, arrest records not reflecting a later conviction may be disseminated by the Bureau either within or outside the Federal Government.

*IV. Dissemination of Arrest Records*

Throughout the years Courts have sought to preserve a citizen's right to privacy against changes in our culture and developing modes of governmental regulation. As early as 1886 the Supreme Court stated in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886), that privacy is inherent in our constitutional form of government. Referring to earlier British precedent the Court noted that privacy was a sacred right, stating:

The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. * * *

A moment's thought demonstrates the wisdom of this precept, as of course many subsequent decisions and commentators have noted.[3] While conduct against the state may properly subject an individual to limitations upon his future freedom within tolerant limits, accusations not proven, charges made without adequate supporting evidence when tested by the judicial process, ancient or juvenile transgressions long since expiated by responsible conduct, should not be indiscriminately broadcast under governmental auspices. The increasing complexity of our society and technological advances which facilitate massive accumulation and ready regurgitation of far-flung data have presented more problems in this area, certainly problems not contemplated by the framers of the Constitution.[4] These developments emphasize a pressing need to preserve and to redefine aspects of the right of privacy to insure the basic freedoms guaranteed by this democracy.

---

3. *See especially* A. Miller, The Assault on Privacy (1971), and his voluminous notes and citations.

4. See *President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Science and Technology,* at 74–77 (1967). Dealing specifically with arrest records, the Commission noted three serious problems in their use:

The record may contain incomplete or incorrect information.

The information may fall into the wrong hands and be used to intimidate or embarrass.

The information may be retained long after it has lost its usefulness and serves only to harass ex-offenders, or its mere existence may diminish an offender's belief in the possibility of redemption.

A heavy burden is placed on all branches of Government to maintain a proper equilibrium between the acquisition of information and the necessity to safeguard privacy. Systematic recordation and dissemination of information about individual citizens is a form of surveillance and control which may easily inhibit freedom to speak, to work, and to move about in this land. If information available to Government is misused to publicize past incidents in the lives of its citizens the pressures for conformity will be irresistible. Initiative and individuality can be suffocated and a resulting dullness of mind and conduct will become the norm. We are far from having reached this condition today, but surely history teaches that inroads are most likely to occur during unsettled times like these where fear or the passions of the moment can lead to excesses. The present controversy, limited as it is, must be viewed in this broadest context. In short, the overwhelming power of the Federal Government to expose must be held in proper check.

■ ■ Menard, formerly a responsible officer in the Marine Corps, will in all likelihood not be hurt by his arrest record as it now stands, but as a citizen he has the right to question the largely uninhibited distribution of information about this episode in his past. Where the Government engages in conduct, such as the wide dissemination of arrest records, that clearly invades individual privacy by revealing episodes in a person's life of doubtful and certainly not determined import, its action cannot be permitted unless a compelling public necessity has been clearly shown. Neither the courts nor the Executive, absent very special considerations, should determine the question of public necessity *ab initio*. The matter is for the Congress to resolve in the first instance and only congressional action taken on the basis of explicit legislative findings demonstrating public necessity will suffice.

■ This brings under pointed analysis the import of the legislation under which the Attorney General has delegated fingerprint identification functions to the bureau. The statute previously quoted, 28 U.S.C. § 534, must be narrowly interpreted to avoid the serious constitutional issues raised by Menard and noted by the Court of Appeals. Viewed in this light, it is abundantly clear that Congress never intended to or in fact did authorize dissemination of arrest records to any state or local agency for purposes of employment or licensing checks.

The statute read as a whole is obviously designed only to facilitate coordinated law enforcement activities between the federal and local government, that is, to assist arresting agencies, courts and correctional institutions in the apprehension, conviction and proper disposition of criminal offenders. Neither the statute nor the debates [5] so much as mention employment, and it is beyond reason to assume that Congress intended that this confidential quasi-investigative data should be handed to anyone who under authority of local ordinance or statute was authorized to take a fingerprint from an applicant for a position in public or private employment. At the time the statute was passed and since, there is no rational or uniform system among the states and local governments for obtaining fingerprints from applicants, and the compelling necessity of federal action to supply criminal information cannot be established by the whim or intolerance of any local board of selectmen.

The principal faults in the present system may be briefly indicated:

(1) State and local agencies receive criminal record data for employment purposes whenever authorized by local

---

5. The legislative history is exceedingly spare. The discussion which did take place in Congress only emphasizes the limitation of the Identification Division to criminal law enforcement purposes. 72 Cong.Rec. 1989 (71st Cong., 2d Sess., Jan. 20, 1930).

enactment. These enactments differ state-by-state and even locality-by-locality within a particular state. See Appendix A. Thus there is no pattern that finds justification either in terms of overall law enforcement objectives or by category of employment.

(2) The Bureau cannot prevent improper dissemination and use of the material it supplies to hundreds of local agencies. There are no criminal or civil sanctions. Control of the data will be made more difficult and opportunities for improper use will increase with the development of centralized state information centers to be linked by computer to the Bureau.

(3) The arrest record material is incomplete and hence often inaccurate, yet no procedure exists to enable individuals to obtain, to correct or to supplant the criminal record information used against them, nor indeed is there any assurance that the individual even knows his employment application is affected by an FBI fingerprint check.

(4) The demands made of the Division for employment data have so increased that the Bureau now lacks adequate facilities to service new applicants who fall within its own vague standards of eligibility.

■ In short, with the increasing availability of fingerprints, technological developments, and the enormous increase in population, the system is out of effective control. The Bureau needs legislative guidance and there must be a national policy developed in this area which will have built into it adequate sanctions and administrative safeguards.[6] It is not the function of the courts to make these judgments, but the courts must call a halt until the legislature acts. Thus the Court finds that the Bureau is without authority to disseminate arrest records outside the Federal Government for employment, licensing or related

purposes whether or not the record reflects a later conviction.

■■ When the statute is thus construed there is no difficulty in upholding it for the limited purpose that was intended. There is a compelling necessity to furnish arrest data to other law enforcing agencies for strictly law enforcement purposes. Arrest records are available in uncovering criminal conduct, they play a significant role in the prosecutor's exercise of discretion, they greatly aid in setting bond, determining sentences an facilitating the work of penal and other institutions of correction. When arrest records are used for such purposes, they are subject to due process limitations within the criminal process, and misuse may be checked by judicial action. The same safeguards are not present when an arrest record is used for employment purposes, often without the knowledge of the person involved. Menard's arrest record will not be expunged where its dissemination outside the Federal Government is limited to law enforcement purposes.

This leaves open for consideration the Federal Government's use of these records for purposes of governmental employment only. Executive Order 10450, *supra*, limited as it has been by previous Court decisions, must be recognized as a proper exercise of the President's responsibilities in the name of national security. There are many Civil Service and other built-in safeguards which protect misuse of this information. It cannot be passed on to private employers, including Government contractors. The Government's discreet use of this information already in its possession for its own limited employment purposes in aid of national security cannot be said to infringe any constitutional right asserted by Menard. While the point is of no consequence in his particular case, the Court ventures to suggest that the Executive Order should be re-examined in

---

6. An extended discussion of the problem and some reasonable recommendations for legislation were made in the Task Force Report on Science and Technology, President's Commission on Law Enforcement and Administration of Justice, pp. 74–77 (1967).

728

the light of present conditions and can in several respects be made more consonant with fair play, particularly if all applicants for federal service receive a personal copy of their record in time to correct or explain any data therein contained.

Menard's prayer for expungement is denied. His arrest record may not be revealed to prospective employers except in the case of any agency of the Federal Government if he seeks employment with such agency. His arrest record may be disseminated to law enforcement agencies for law enforcement purposes. An appropriate order to this effect is attached.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

## APPENDIX A

SAMPLE OF PERSONS REQUIRED TO BE FINGERPRINTED BY STATE OR LOCAL STATUTE, ORDINANCE OR RULE

*Glendale, Arizona:*

Taxicab drivers and operators; transient, itinerant or traveling merchants, peddlers, private detectives, solicitors or canvassers, massage parlor operators, and employees.

*Denver, Colorado:*

Any applicant for a driver's license.

*District of Columbia:*

Auctioners, fortune tellers, hackers, junk dealers, mediums, parking lot attendants, pawnbrokers, second hand dealers, solicitors, vendors; operators of billiard parlors, bowling alleys, detective agencies, massage establishments, pool rooms, shooting galleries; ABC licensees.

*Town of Manalapan, Florida:*

Every person employed in any club, any place handling liquor, beer or wine in any form, motels, hotels, apartment houses, health spas, hospitals, and all newspaper carriers over the age of sixteen years, service station employees, special police officers, nurses, boat captains and crew members, town employees, estate mainte-

nance employees, including lawn men, gardeners, and caretakers, and all domestic servants in the town.

*State of Idaho:*

All real estate salesmen and brokers.

*State of Maryland:*

Pari-mutuel employees and stable employees, including but not limited to foremen, exercise boys and grooms.

*Springfield, Missouri:*

Female entertainers performing in establishments serving intoxicating beverages.

*State of Nevada:*

Every applicant for a license to practice medicine.

*State of North Carolina:*

Applicants for admission to the Bar.

*Provincetown, Massachusetts:*

All non-residents seeking employment.