John Brent TARLTON, Plaintiff,

v.

William B. SAXBE, Defendant.

Civ. A. No. 1862–71.

United States District Court,
District of Columbia.

Feb. 20, 1976.

Russell H. Carpenter, Jr., Washington, D. C., for plaintiff.

Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiff filed this action in 1971 seeking a modification of his FBI criminal record or, alternatively, an injunction against its dissemination to correctional and judicial officials. The Court of Appeals reversed the District Court's dismissal of plaintiff's complaint and remanded for consideration of the following question: "[T]o what extent, if any, does the FBI have a duty to take reasonable measures to safeguard the accuracy of information in its criminal files which is subject to dissemination"? *Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 507 F.2d

1116, 1121 (1974). The facts underlying plaintiff's claim are set forth in the Court of Appeals opinion, *id.* at 1133–37, 1143 (Wilkey, J., dissenting), and need not be detailed here, other than to point out that plaintiff has completed the sentence he was serving during lower court and appellate proceedings and is now apparently living in Texas. The matter is before the Court on Cross Motions for Summary Judgment.

## I

The FBI Identification Division maintains criminal records for some 21.4 million individuals.[1] Approximately 10,000 fingerprint cards are submitted to the FBI each workday by the 7,000 contributing federal, state, and local criminal justice agencies, and appropriate information is transferred to an individual's master card. Upon request the FBI disseminates criminal records in the form of a "rap sheet" to authorized recipients, including criminal justice agencies, courts, banks, and federal and certain non-federal employers. An individual may obtain a copy of his FBI criminal record by providing satisfactory proof of identity and paying a small fee. 28 C.F.R. §§ 16.32–.33 (1975). In the first two years during which access to records was permitted, 2,145 individuals requested and obtained copies of their FBI record.

Dispositional information on cases is furnished to the FBI by contributing criminal justice agencies or by local courts. Although almost 70% of the FBI's criminal records include at least one arrest without any indication of final disposition, the rate of reporting has improved substantially in the past two fiscal years.[2] Of the dispositions received, 20% are submitted within 90 days of the arrest and an additional 30% within 180 days.[3]

■ Several general propositions help summarize the current state of the law regarding the FBI's responsibility for maintenance and dissemination of criminal records. 1.) 28 U.S.C. § 534(a) (1970) and 28 C.F.R. § 0.85(b) (1975), authorizing the acquisition and exchange of fingerprint identification records, require the FBI to act "reliably and responsibly and without unnecessary harm" to an individual's right of privacy.[4] The FBI is not merely a repository for records but is also the focal point of a vast, nationwide distribution network. 2.) An individual's arrest record—whether accurate or inaccurate—can have far-reaching social, judicial, and economic consequences.[5] 3.) Challenges to FBI arrest and conviction records, e. g., for cor-

1. *See Menard v. Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1017, 1020–22 (D.C.Cir. 1974), *rev'g* 328 F.Supp. 718, 720–23 (D.D.C.1971) (detailed description of FBI criminal record system). *See also* Deposition of Frank B. Still, Jr., Deputy Assistant Director, FBI Identification Division, at 20–31, filed Nov. 14, 1975 (processing of FBI fingerprint cards) [hereinafter cited as Still Dep.].

2. In fiscal year (FY) 1974, about 2.3 million arrest records were retained by the FBI; in that year, 2.2 million dispositions—either for FY 1974 arrests or those of previous years—were submitted. In FY 1975, 2.3 million arrest records were retained; 2.5 million dispositions—either for FY 1975 arrests or those of previous years—were submitted. Affidavit of Frank B. Still, Jr., Deputy Assistant Director, FBI Identification Division, ¶ 5, filed July 11, 1975 [hereinafter cited as Still Aff.]; Attachment A to Pl.'s Statement of Disputed Facts, ¶ 1, filed Dec. 15, 1975 (FY 1975 Statistics).

3. Still Dep. at 90–91.

4. *Menard v. Saxbe, supra,* 498 F.2d at 1026.

5. *Menard v. Mitchell,* 139 U.S.App.D.C. 113, 430 F.2d 486, 490–92 (1970). *See also Utz v. Cullinane,* 520 F.2d 467, 478–83 (D.C.Cir. 1975); cases cited in note 23, *infra; Paul v. Davis,* —— U.S. ——, —— n.18, 96 S.Ct. 1155, 1177, 47 L.Ed.2d 405, 434, 44 U.S.L.W. 4337, 4350 n.18 (1976) (Brennan, J., dissenting). It should be noted that the *Utz* case, prohibiting the routine dissemination of arrest information to the FBI, is not controlling here for two reasons. In *Utz* a local ordinance was held to bar distribution of District of Columbia criminal records. And, the challenged FBI redissemination was for other than law enforcement purposes, i. e., for use in matters of employment and licensing. *Cf. Tarlton v. Saxbe, supra,* 507 F.2d at 1121 n. 7 and accompanying text.

rection or expungement, are properly brought at the state or local level in the first instance. "Exhaustion of remedies" is ordinarily a prerequisite to suit against the FBI.[6] 4.) Courts have repeatedly invited legislative attention to the matters of accuracy, completeness, and currency in the FBI's fingerprint record system.[7]

## II

Plaintiff seeks four major procedural reforms in the FBI's system of handling criminal records: imposition of a duty of inquiry upon notice of a challenge to FBI criminal record information; requirement to indicate upon a criminal record any pending challenge; prohibition against dissemination of any entries relating to "non-serious offenses;" and ban on distribution of any arrest record with entries more than one year old without reported disposition.[8] Defendants contend that the FBI's current procedures are reasonable and adequate, that considerations of federal-state comity preclude FBI intervention in the affairs and processes of local criminal justice agencies, and that administrative

reasons such as costs and personnel justify the FBI's unwillingness to implement plaintiff's proposals. The Court will consider *seriatim* the specific reforms suggested by plaintiff.

## A

■ Current FBI regulations require an individual seeking correction or updating of his criminal record to "make application directly to the contributor of the questioned information."[9] The FBI will change its records only after official notification from the contributing agency or upon receipt of a court order. This practice accords with the general "exhaustion of remedies" requirement, *supra*, note 6. The FBI is in no position to guarantee the accuracy of criminal information or to resolve conflicting factual, legal, or constitutional issues raised by way of record challenges. Rather, "[w]ith the local enforcement agency as defendant, complete relief can be granted, both to obtain such action on local records as may be needed, and to have local authorities request the return of records" from the FBI.[10]

---

6. *Tarlton v. Saxbe, supra*, 507 F.2d at 1127–28 & n. 34; *id.* at 1136 n. 11 (Wilkey, J., dissenting) (criticism of possible collateral attack in federal court on previous local convictions and arrests); *Menard v. Saxbe, supra*, 498 F.2d at 1025–26. *Cf. Palmore v. Superior Court*, 169 U.S.App. 323, 515 F.2d 1294, 1313–14 (D.C.Cir. 1975), *cert. granted*, 424 U.S. ——, 96 S.Ct. 1101, 47 L.Ed.2d —— (1976) (No. 75–811).

7. *See, e. g., Tarlton v. Saxbe, supra*, 507 F.2d at 1131; *id.* at 1131–33, 1142 (Wilkey, J., dissenting); *Menard v. Mitchell, supra*, 430 F.2d at 494–95 & n. 51; *Menard v. Mitchell, supra*, 328 F.Supp. at 727. *See also* note 10 *infra*.

8. These proposals originate from the general areas of inquiry suggested by the Court of Appeals. *Tarlton v. Saxbe, supra*, 507 F.2d at 1129–30.

Defendants have stipulated to the revision of plaintiff Tarlton's FBI criminal record, including deletion of non-serious offenses, deletion of detentions and mere investigations, obtaining dispositions for all arrest entries which are over one year old without disposition, and forwarding record challenges to appropriate local submitting agencies for consideration and necessary action. Defendants emphasize that

these actions relate to plaintiff alone and are based wholly upon the record in this action. *See* (Second) Affidavit of Frank B. Still, Jr., at 3, filed Jan. 30, 1976.

9. 28 C.F.R. § 16.34 (1975); *id.* § 20.34(b) (similar National Crime Information Center regulation). *See also* Still Aff., ¶¶ 5–6.

10. *Menard v. Saxbe, supra*, 498 F.2d at 1025; *see also Tarlton v. Saxbe, supra*, 507 F.2d at 1128 ("local courts which supervised the arrest or entered the conviction under attack should make the initial determination as to the validity of that arrest or conviction"). *Cf. Rizzo v. Goode*, —— U.S. 362, —— —— ——, 96 S.Ct. 598, 607–09, 46 L.Ed.2d 561, 573–75 (1976) (caution urged for use of federal equitable power in affairs of state and local governments).

Recent legislation prepared by the Department of Justice with the approval of the FBI contains provisions for challenges to criminal record information, including a hearing before the local contributing agency. *See* H.R. 61, §§ 208(b)(2)–(6), 94th Cong., 1st Sess. (1975); *cf.* 28 C.F.R. §§ 20.21(g)(2)–(5) (1975) (correction procedures required in information systems of state criminal justice agencies). However, this bill has apparently been superseded by H.R. 8227, §§ 209(a)–(b), which requires

However, state and local responsibility does not imply non-responsibility on the part of the FBI.[11] The FBI at a minimum has a duty to *forward* challenges to appropriate criminal justice agencies and courts for investigation and the initiation of correction procedures. This will not involve drastic reforms within the FBI criminal record system. A brief, individualized letter or a form memorandum can be attached to the challenge and sent to the appropriate agency or court. If the matter involves a routine or typographical error, the agency or court can swiftly consider the challenge and advise the FBI to make necessary corrections in its records. More serious and difficult challenges will, of course, require more elaborate administrative and judicial proceedings on the state and local level. In any event, the FBI has advanced no persuasive administrative or jurisdictional limitations which would prevent its forwarding of record challenges to the proper state and local channels.[12]

and nature of a pending challenge, especially if the fact-finding or adjudicatory process is lengthy. The Court, however, recognizes the practical problems in such a procedure. The credibility of FBI criminal records would be hampered by notations alleging inaccuracy or incompleteness. A patchwork sheet of asterisks, coded symbols, or long-hand explanations could render a criminal record useless. Permitting such notations could encourage frivolous challenges as well as create a substitute forum for correction proceedings.[13] Hopefully, the challenge proceedings *supra* will move expeditiously so as to lessen the prejudice caused by erroneous information. Rather than order the inclusion of symbols or exculpatory statements in a criminal record during the course of a challenge, the Court prefers to rely upon formal challenge proceedings and upon the person-to-person communication possible between a suspect or defendant and the authorities utilizing material in his criminal record.[14]

### B

■ Plaintiff contends that an individual's record should reflect the existence

the criminal justice agency *maintaining* the record to entertain challenges to accuracy and completeness. *See* 121 Cong.Rec.H 6297 (daily ed. June 26, 1975) (remarks of Rep. Edwards, sponsor of measure). The Justice Department has opposed these provisions of H.R. 8227. *See* Hearings on H.R. 8227 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 1st Sess. (July 14, 1975) (testimony of Harold R. Tyler, Jr., Deputy Attorney General; presently unpublished).

11. *Tarlton v. Saxbe, supra,* 507 F.2d at 1128 n. 34, 1129. *See also* Comment, Criminal Law— F.B.I. Retention of Criminal Identification Records—*Tarlton v. Saxbe,* 29 Rutgers L.Rev. 151, 156–71 (1975) (analysis of FBI responsibilities under *Tarlton*); Note, 53 Tex.L.Rev. 1308, 1316–21 (1975) (same). At present, the FBI simply returns challenges to record subjects and directs them to proceed before submitting agencies. Still Aff., ¶ 6; Still Dep. at 28–30.

12. *See Tarlton v. Saxbe, supra,* 507 F.2d at 1129. The FBI estimated a cost of $7.53 per challenge to notify a state or local agency of an individual's request for record correction, and presumed that between 10 and 11 million

### C

■ Since early 1973 the FBI has not accepted criminal fingerprint cards relat-

persons would file challenges. Defs.' Answer to Interrogatory No. 1(c), filed Oct. 24, 1975; Still Dep. at 118–24 (itemizing of costs). The cost figure, however, was based upon an individualized letter of inquiry for each challenge, rather than the possible use of a form letter. The FBI estimate of probable challenges appears unrealistic since only about 1,000 persons per year have even sought copies of their criminal record.

13. *See* Still Aff., ¶ 9; Still Dep. at 128 (specter of "massive records traveling about the country with every individual having the opportunity to have his side of the conflict with the criminal justice system explained to his satisfaction"). *Cf. Menard v. Saxbe, supra,* 498 F.2d at 1029 (FBI obligation to "take account of *responsible information*") (emphasis supplied).

14. *Cf. Tarlton v. Saxbe, supra,* 507 F.2d at 1140–42 (Wilkey, J., dissenting) (opportunity for person accused or convicted to comment upon criminal record). Consideration of the problem and of plaintiff's proposals may be appropriate in the feasibility study of certain facets of the FBI computerization program. *See* Part II–D, *infra.*

ing to non-serious offenses, such as drunkenness, vagrancy, traffic violations, and juvenile offenses.[15] Non-serious offenses predating this change in policy have remained in an individual's file.[16] However, if a non-serious offense is presently the only entry in a subject's record, it is deleted upon request for dissemination and the requesting party informed that the subject has no criminal record. Approximately one-third of the FBI's 21.4 million records contain only one offense. In addition, as the FBI converts its records into computerized files, non-serious offenses will be deleted from all criminal records except those of individuals over the age of 35. This will account for about two-thirds of the remaining 14 million files.[17]

Plaintiff's proposal for deleting non-serious offenses would thus affect a limited class of individuals—those persons (numbering perhaps 5 million) over age 35 whose records include both serious and non-serious offenses. Deleting non-serious offenses in these individuals' records upon request for dissemination would be neither unreasonable nor overly expensive. The deletion of such offenses, as noted, is already a firm policy of the FBI. Moreover, non-serious offenses are deleted and the entire rap sheet retyped for *any* individual (whether under or over 35) when requested by a banking institution or a non-federal employer.[18] Recognizing that persons over 35 "slow down in their criminal activities,"[19] the FBI apparently believes

---

**15.** Still Aff., Exh. VI (FBI letter of Feb. 9, 1973 to all fingerprint contributors). 28 C.F.R. § 20.32(b) (1975) expresses this present FBI policy: "Excluded from such a system [of criminal records maintained] are arrests and court actions limited only to nonserious charges, e. g., drunkenness, vagrancy, disturbing the peace, curfew violation, loitering, false fire alarm, non-specific charges of suspicion or investigation, traffic violations (except data will be included on arrests for manslaughter, driving under the influence of drugs or liquor, and hit and run). Offenses committed by juvenile offenders shall also be excluded unless a juvenile offender is tried in court as an adult."

Such a policy has significantly reduced the annual number of fingerprint cards retained by the FBI. FY 1975's total was roughly 33% fewer than the total retained in FY 1972. *See* note 2, *supra;* Still Aff., ¶ 5.

**16.** 28 C.F.R. § 20.32(c) (1975). *Cf.* Tarlton v. Saxbe, *supra,* 507 F.2d at 1134, 1142–47 (Wilkey, J., dissenting) (discussion of non-serious offenses in plaintiff's criminal record).

**17.** *See generally* Still Dep. at 22–25, 115–17; Hearings on Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for 1976 Before a Subcomm. of the House Comm. on Appropriations, 94th Cong., 1st Sess., pt. 2 (Department of Justice), at 209–10 (1975) (testimony of Clarence M. Kelley, FBI Director, on automation of FBI fingerprint records).

The FBI's computerization program and statistics are well summarized in Pl.'s Statement of Material Facts Not in Dispute, ¶¶ 10–11, filed Dec. 8, 1975: "[T]he Identification Division has maintained an automated or compu-

terized file since [Aug. 31,] 1973. At present this file includes only the records of subjects whose first reported arrest occurred after the system was established. For such subjects, the computer will print out a rap sheet automatically. (Still Dep. at 31–32, 41–42).

"The Identification Division plans to begin converting its presently nonautomated files in the middle of 1976. The plan is to convert first the records of all subjects under the age of 35. Such subjects, whose records are the most active, account for about two-thirds of the 21 million individual records on file. The Identification Division estimates that conversion of that portion of the files will be completed about two [to three] years after it is begun. No decision has yet been made as to whether the files of subjects over the age of 35, for which there are relatively few requests for dissemination, will then be computerized as well. (Still Dep. at 42–43, 115–16)."

The 1974 *Menard* case, *supra,* noted, "[A] computerization program is proceeding apace, increasing the Division's effectiveness, and enhancing its capacity for both good and harm." 498 F.2d at 1026 n. 29. *See also Menard v. Mitchell, supra,* 328 F.Supp. at 725–26; President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Science and Technology, at 74–77 (1967); Comment, Privacy, Law Enforcement, and Public Interest: Computerized Criminal Records, 36 Mont.L.Rev. 60, and sources cited at note 34 (1975). *Cf.* Privacy Act of 1974, 5 U.S.C.A. § 552a (Supp.1976).

**18.** Still Dep. at 77–78; *cf.* 28 C.F.R. § 50.12(b) (1975).

**19.** Still Dep. at 118.

that few requests for such individuals' records will be received. And, the cost of retyping such records is not prohibitive.[20] The Court therefore directs that upon request for dissemination, the FBI criminal records which are not initially to be computerized (i. e., those of individuals over 35) should be retyped with references to non-serious offenses deleted.

## D

██ The final area addressed by plaintiff upon remand concerns dissemination of arrest records more than one year old without disposition. Furnishing dispositions is, of course, primarily the responsibility of local criminal justice agencies and courts. The FBI provides forms for final dispositions and periodically urges its contributors to submit dispositional information as soon as it is available.[21] The FBI itself does not make requests for dispositions to local agencies or courts, allegedly because of the volume

of records processed and the difficulty in locating the proper adjudicatory level of an arrest. No sanctions are imposed upon local agencies for failure to submit dispositions.[22] The FBI, however, does not disseminate year old, "open" arrest records to non-federal and non-law enforcement agencies; instead it retypes the rap sheet to delete references to such arrests. 28 C.F.R. §§ 50.12(b)–(c). As previously indicated, overall statistics show that while 70% of the FBI criminal records contain at least one offense without disposition, the reporting rate has improved significantly in recent years. *See* note 2 *supra.*

The Court is aware of the potential harm to an individual whose arrest record lacks dispositional data,[23] and notes that the FBI's computerizing of its criminal records might include certain corrective measures, such as a "tickler" system.[24] At the present time, however, the Court is reluctant either to require the FBI to track down missing disposi-

**20.** The FBI estimates the cost of removing a non-serious offense from one criminal record to be $3.12. Answer to Interrogatory No. 2, *supra* note 12; Still Dep. at 133–34 (discussion of cost estimate figure).

**21.** *See, e. g.,* Still Aff., Exhs. I–V (FBI communications to contributors concerning final dispositions, dated June 2, 1971, July 22, 1971, Oct. 2, 1972, Nov. 15, 1973, and Mar. 14, 1975); Still Aff., ¶ 5.

Plaintiff's FBI record included several arrests more than 20 years old without dispositions. Judge Wilkey's dissent contended, nevertheless, that plaintiff suffered no prejudice because of the incompleteness of his record. *Tarlton v. Saxbe, supra,* 507 F.2d at 1134, 1143–45.

**22.** New regulations require agencies contributing to the FBI's Computerized Criminal History (CCH) File, a program within the National Crime Information Center, to submit dispositions on arrests within 120 days of the final disposition. An agency failing to comply may have its access to the FBI criminal record system cancelled. 28 C.F.R. §§ 20.37–.38 (1975); *id.* § 20.21(a)(1) (90 day period for state-administered information systems); *see* 42 U.S.C. § 3771(b) (Supp. III, 1973) (enabling statute with procedural requirements for state and local criminal history information systems funded through LEAA grants). About seven or eight states are participating in the CCH program, which includes 700,000 criminal

records and permits state agencies to have direct access to record information through their own computer terminals. Still Dep. at 32–41; 28 C.F.R. § 20.31(a).

Judge Leventhal in *Menard* scored the FBI's lack of aggressiveness in policing the *use* of its records, noting that only six contributors had been suspended since 1924. 498 F.2d at 1028 n. 41; *see* 28 U.S.C. § 534(b) (1970) (FBI cancellation authority).

**23.** *See, e. g., Crow v. Kelley,* 512 F.2d 752 (8th Cir. 1975); *Shadd v. United States,* 389 F.Supp. 721 (W.D.Pa.1975); *United States v. Mackey,* 387 F.Supp. 1121 (D.Nev.1975). Suspects or prisoners in each of these actions alleged, *inter alia,* "stale" arrests resulting in police harassment or other personal detriment. *See also United States v. Linn,* 513 F.2d 925 (10th Cir. 1975); *United States v. Seasholtz,* 376 F.Supp. 1288 (N.D.Okla.1974); *People v. Santos,* 82 Misc.2d 184, 368 N.Y.S.2d 130 (Sup.Ct.1975).

**24.** The concept and mechanics of a "tickler" system were explored at length in a deposition in this action. *See* Still Dep. at 75–83, 95–112. Unfortunately, the FBI's cost estimates assumed an entirely manual system. Plaintiff's papers proposed alternatively some type of FBI inquiry system when a local agency's request sought dissemination of a record with a "stale" arrest. Mem. in Support of Cross Motion for Summary Judgment at 25–26, filed Dec. 8, 1975.

tions or to impose rigid requirements in this difficult and uncharted area. New regulations, *supra* note 22, address the problem for a limited number of files and impose serious sanctions upon criminal justice agencies failing to submit final dispositional data. Experience will judge the effectiveness of these regulations and indicate whether the time strictures and sanctions included should be expanded to the entire FBI criminal record system.[25] The challenge and corrections process outlined above may be utilized to acquire dispositions or deletions for outdated criminal record entries. Balancing personal rights with the valid needs of the criminal justice system, the Court cannot order the wholesale expungement or non-dissemination of criminal records not meeting an arbitrary temporal yardstick. The inadvertence or negligence of one criminal justice agency should not be compounded to provide post-factum "pardons" or expungements for guilty offenders. Nor should one agency's careless actions work to impede the legitimate efforts of other criminal justice officials, including law enforcement personnel, prosecutors, judges, and correctional authorities.

Notwithstanding the above, the Court believes that the FBI should give further consideration to this problem. Despite the major (and costly) computer conversion project now under way, no feasibility study or cost-benefit analysis has been performed by the FBI relating to the initiation of a "tickler" system or some other method of assuring currency in the record system.[26] The FBI cannot proceed undisturbed by the serious danger to individuals caused by unreported dispositions and "stale" files, nor can it totally relegate responsibility for such deficiencies to local agencies and courts. Further, the cost estimates provided for the "obsolete" manual operation, *supra* note 24, are of little use to the Court in determining reasonableness. The Court therefore directs the FBI to conduct a feasibility study concerning such systems and procedures as would enable the FBI to keep the disposition entries in its criminal records reasonably current.

### III

In summary, the Court holds: that challenges to FBI criminal records must ordinarily proceed first before appropriate local agencies or courts, and that the FBI has the responsibility to forward such challenges to the proper local channels for consideration; that a pending challenge need not be reflected on an individual's FBI criminal record; that non-serious offenses are to be deleted from all FBI criminal records—upon request for dissemination for all individuals over age 35, and upon conversion to computerized files for all other individuals; and that year old arrest records without dispositions may presently be disseminated for law enforcement purposes, but that the FBI must conduct a feasibility study relating to methods of keeping disposition entries on criminal records reasonably current.

Within 30 days of the date of this Opinion, the parties shall submit (jointly and individually) proposed Orders implementing the requirements included herein.

---

**25.** *Cf. Tarlton v. Saxbe, supra,* 507 F.2d at 1125–26 n. 28. In *Tarlton,* the Court viewed 42 U.S.C. § 3771(b)—implemented by 28 C.F.R. § 20.1 *et seq.*—as relevant and instructive for the FBI's duties under 28 U.S.C. § 534. "[T]he FBI has a duty to take reasonable measures to maintain accurate criminal records, since the same concerns which led Congress to impose a duty on state and local law enforcement officials in regard to their criminal files apply equally to the FBI and its criminal files." *Id.*

**26.** The FBI apparently had a general feasibility study or cost benefit analysis performed in 1969 when it was considering automating its criminal record system. No study then or since has dealt more specifically with the matters of accuracy and currency in the record system. *See* Still Dep. at 137–45; Defs.' Answer to Interrogatory No. 5, *supra* note 12; Defs.' Opp. to Pl.'s Cross Motion for Summary Judgment at 3, filed Jan. 30, 1976.