Jackie E. UTZ et al., Appellants,

v.

Honorable Maurice CULLINANE.

No. 72–1116.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 10, 1975.

Decided Oct. 3, 1975.

Louis M. Seidman, Washington, D. C., was on the brief for appellants. William W. Taylor, III, Washington, D. C., entered an appearance for appellants.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief for appellees.

Before WRIGHT and ROBINSON, Circuit Judges, and MERHIGE,* District Judge.

Opinion for the Court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

Appellants in this case challenge on both constitutional and statutory grounds the Metropolitan Police Department's policy of routinely transmitting to the Federal Bureau of Investigation the fingerprint cards and accompanying identification data of individuals who are arrested in the District of Columbia. Although we believe there is substantial merit to appellants' constitutional contentions, we do not premise our holding on those grounds, for we believe there are narrower statutory grounds on which we must interdict this indiscriminate dissemination of arrest records in the absence of a specific FBI request for par-

---

* Of the United States District Court for the Eastern District of Virginia, sitting by designation pursuant to 28 U.S.C. § 292(d).

ticular data to be used by the FBI or other law enforcement officials for strictly law enforcement purposes.

## I

On January 7, 1971, shortly before the effective date of the District of Columbia Court Reform and Criminal Procedure Act of 1970,[1] appellants—four individuals arrested for and charged with local criminal offenses—brought a class action[2] for injunctive and declaratory relief to enjoin appellees—the Chief of Police and the Director of the Central Records Division of the Washington, D.C., Metropolitan Police Department— from transmitting appellants' arrest records to the FBI and to request the return of those records already transmitted. Plaintiffs-appellants asserted that the Metropolitan Police lacked a statutory basis for engaging in this practice, which was also allegedly specifically prohibited by the "Duncan Ordinance," a regulation promulgated by the District's Board of Commissioners to govern the distribution of arrest records in this jurisdiction.[3] Plaintiffs-appellants further asserted that the preconviction or postexoneration dissemination of their arrest records abridged their constitutional rights to due process, privacy, and the presumption of innocence.

Appellant Utz was arrested on January 7, 1971 and was charged with possession of marijuana. Her case was subsequently "no papered" by the United States Attorney, and she allegedly represents the class of individuals ultimately exonerated of the charges lodged against them. Appellant Boyd was arrested on

January 6, 1971 and was charged with petit larceny. At the time the complaint in this case was filed he had been released on a personal bond and was awaiting trial in the Court of General Sessions; although a *nolle prosequi* was entered on this charge before the District Court's ruling in this case, he allegedly represents the class of individuals who have not yet been brought to trial and who are thus presumed to be innocent of charges pending against them.[4] Appellant Leon M., a juvenile who brought his action by his mother and next friend, Jean M., was arrested on October 27, 1970 for unauthorized use of a motor vehicle, and he allegedly represents the class of juveniles charged in the Juvenile Branch of the Family Division of the Superior Court for the District of Columbia. The charge against Leon M. was dismissed on December 14, 1970, when he entered a plea of guilty to another traffic offense and he was sentenced to 60 days of court supervision and traffic school. Appellant Bolling was arrested on November 20, 1970 and charged with possession of numbers slips. He entered a plea of guilty to this charge on December 30, 1970 and was sentenced to one year of probation; he allegedly represents those individuals who are actually found guilty of the offenses for which they were arrested, and premises his challenge to the Metropolitan Police Department's practices solely on statutory grounds.

Before the arrests which formed the predicate for this case, none of the named plaintiffs-appellants had a criminal record. Although they do not allege

1. 84 Stat. 473 *et seq.* The relevant provisions of the statute took effect on February 1, 1971. *See also* note 9, *infra.*

2. Although the District Court had not ruled on the appropriateness of this case for class action treatment at the time summary judgment was granted, our analysis would appear to apply to all individuals arrested in this jurisdiction after October 31, 1967. *See generally,* 172 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 483–491 *infra.* However, we leave it to the District Court on remand to identify any certifiable classes and to fashion any relief

considered necessary in light of the holding of this court.

3. *See* 172 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 483–486 *infra.*

4. The same day the District Court granted appellees' motion for summary judgment Albert Hopkins, an individual who had been charged with but not yet tried for a local offense, submitted a motion to intervene as a plaintiff representing the class of individuals awaiting trial. In light of the District Court's action later that day, there was never a ruling on this motion.

that their arrests were made without probable cause and thus do not seek expungement of their arrest records, appellants contend that the dissemination of those records to the FBI, and inevitable nationwide redissemination by the FBI, will cause them irreparable injury. More particularly, appellants in their complaint maintain that fingerprint cards (containing data identifying the person arrested and information concerning the arrest) of all persons arrested and fingerprinted by the Metropolitan Police Department are routinely transmitted to the FBI, regardless of whether the charges are dismissed, "no papered," "nollied," reduced, or terminated through an acquittal, and that this dissemination normally transpires before a court disposes of the case. These data submitted to the FBI are allegedly added to the FBI's Computerized Criminal History File (part of the FBI's National Crime Information Center), from which a master "rap" sheet is prepared listing each person's name, his identifying data, the date of the arrest, and the offense or offenses for which he was arrested; the "rap" sheet is allegedly disseminated upon request to over 14,500 public and private agencies including the United States Civil Service Commission, the Armed Services, banks, and state and local governments, which allegedly utilize that information adversely for employment and promotion purposes to the detriment of appellants and other individuals listed in the FBI's criminal[5] data bank.

Both plaintiffs-appellants and defendants-appellees moved for summary judgment and submitted the same affidavit of the Director of the Central Records Division of the Metropolitan Police Department describing the practice of that Department with respect to the dissemination of arrest records to the FBI.

The Director averred that the Metropolitan Police Department "routinely" forwarded to the FBI the arrest records of all adults who are "charged with a felony or violation of laws against the United States" or "who because of the type of offense committed and/or records of arrest are likely to be wanted by other local or federal law enforcement agencies" or who are arrested for "participating in mass demonstrations," as well as the arrest records of all juveniles "16 years or older who have been charged with a felony."[6] He also reported that as of October 1971, "all appropriate records forwarded to the FBI are subsequently supplemented with entries that reflect Court disposition." The parties amplified on this affidavit by stipulating that the fingerprint cards of these arrestees are sent to the FBI "within several days of the arrest and generally before trial," as are the arrest records of "most misdemeanants, excepting traffic violat[ors], charged with violations of the D.C. Code and arrested by the Metropolitan Police."[7] It was also stipulated that the arrest records of appellants Leon M. and Bolling had already been submitted to the FBI, that the records of appellants Utz and Boyd would have been routinely sent to the FBI but for an agreement between counsel not to do so pending the outcome of this case, and that although the FBI will return these records to the Metropolitan Police Department at the latter's request, the FBI will continue to keep and disseminate all records, regardless of court disposition, unless such a return of the records is requested by the Metropolitan Police.[8]

■■■ With the case in this posture District Judge Gesell granted appellees' motion for summary judgment, reasoning in an oral opinion that appellants' constitutional arguments lacked "sub-

5. *See Menard* v. *Saxbe*, 162 U.S.App.D.C. 284, 288, 295, 498 F.2d 1017, 1021, 1028 (1974).

6. Affidavit of Morris B. Bagley in *Utz* v. *Wilson*, D.D.C. Civil Action No. 45–71 (affidavit of Nov. 3, 1971, filed Nov. 30, 1971). *See also* brief for appellees at 5–6.

7. Stipulation in *Utz* v. *Wilson*, D.D.C. Civil Action No. 45–71 (stipulation filed Nov. 19, 1971).

8. *Id.*

stantiality" and that the "Duncan Ordinance" was inapplicable to the relationship between the Chief of Police and the FBI.[9]

**9.** The District Court also apparently thought that the FBI was an indispensable party to this litigation:

> [E]ven if the constitutional issue existed, the Court is without power to do anything about it because this case does not include any Federal defendants and there would be no way of implementing any order that the Court should issue, nor is there an issue before the Court which presents even a scintilla of data as to the practical and other problems that might be present in attempting to work out some limited delay of dissemination of arrest data by the FBI. This Court cannot undertake ex cathedra to try to regulate a Federal agency that isn't even before the Court.

*Utz* v. *Wilson,* D.D.C. Civil Action No. 45–71 (oral opinion of Nov. 29, 1971), *reproduced in* brief for appellants at Appendix B. Although it would have been preferable if appellants had joined the FBI as a defendant so that its practices in disseminating data submitted to it by contributing agencies such as the Metropolitan Police Department could have been fully explored, the District Court was fully cognizant of those practices in light of its experience with *Menard* v. *Mitchell,* 328 F.Supp. 718 (D.D.C.1971), *reversed, Menard* v. *Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974). And although the fact that the FBI is not a party to this litigation increases our reluctance to decide the constitutional issues presented by this case, *see* 172 U.S.App.D.C. p. ——, 520 F.2d p. 483 *infra,* no such problems are presented by the statutory question of whether the local "Duncan Ordinance" prohibits the Metropolitan Police from routinely transmitting arrest records to the FBI. Indeed, the United States Attorney stated that the United States has "no interest which it seeks to protect" in this case, and that "adherence by the Metropolitan Police Department to the Duncan Ordinance is consistent with the position of the Federal Bureau of Investigation." *See* 172 U.S.App.D.C. p. ——, 520 F.2d p. 486 *infra.* Moreover, full relief was possible even in the absence of the FBI since the injunction sought (prohibiting the dissemination of arrest records by the Metropolitan Police) would run solely against the named defendants-appellees and their agents, and since the parties stipulated that the Metropolitan Police remained the owners of those records already submitted to the FBI, which would return them upon request. We thus fail to comprehend the basis for the District Court's concern that it was without power to effectuate any relief or that relief would necessarily entail an injunction ordering the FBI (rather than the Metropolitan Police Department) to alter its practices in disseminating arrest records.

Appellees also urge upon us a spectrum of procedural or jurisdictional rationales for not deciding various aspects of this case on the merits. First, citing *Younger* v. *Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Kugler* v. *Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15, 43 *U.S.L.Week* 4487 (1975), and *Huffman* v. *Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, 43 *U.S.L.Week* 4379 (1975), appellees insist that principles of comity dictate that the "arrest record relief" sought by appellants is ancillary to local criminal prosecutions and must be sought in the local courts. *Younger* held that principles of comity and federalism compel the conclusion that "national policy forbid[s] federal courts to stay or enjoin pending state court proceedings except under special circumstances," *see* 401 U.S. at 41, 91 S.Ct. at 749; *see also id.* at 43–44, 91 S.Ct. 750 (equity court should not restrain criminal prosecution when moving party has adequate remedy at law and will not suffer irreparable injury if equitable relief is denied), and that principle has recently been substantially extended to prevent interference with an ongoing state civil proceeding "in aid of and closely related to criminal statutes," *see Huffman, supra,* 420 U.S. at 604, 95 S.Ct. at 1208, 43 *U.S.L.Week* at 4383 (also holding interference improper if litigant has not exhausted state appellate remedies). *See also Hicks* v. *Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223, 43 *U.S.L.Week* 4857, 4862 (1975) (principles of *Younger* "apply in full force" "where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court"). However, it is clear that, at least before the advent of the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473 *et seq.,* "the District Court was filling the role of both a local and federal court." *See, e. g., Palmore* v. *United States,* 411 U.S. 389, 392 n. 2, 93 S.Ct. 1670, 1673 n. 2, 36 L.Ed.2d 342 n. 2 (1973). *See also, e. g., District of Columbia* v. *Carter,* 409 U.S. 418, 429, 432, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). Appellants filed their claim in the District Court before the effective date of the Court Reorganization Act, invoking jurisdiction under, *inter alia,* D.C. Code § 11–521 (1967). Thus the District Court was acting at least in part as a local court in this proceeding, and Congress explicitly provided that the District Court would continue to act in that capacity with respect to civil actions such as the present one. *See* D.C. Code § 11–921(b) (1973). *See also* D.C. Code § 11–922 (1973) (transfer of certain cases from District

Court to Superior Court proper, but not in cases seeking equitable relief). Moreover, although we had held that the District of Columbia Court of General Sessions had the power to issue ancillary relief concerning the dissemination of arrest records regarding persons tried in the Criminal Division of that court, *see Morrow* v. *District of Columbia,* 135 U.S.App. D.C. 160, 417 F.2d 728 (1969), it was conceded that that court had no original jurisdiction to issue such orders, *see id.,* 417 F.2d at 737. Thus, for someone such as appellant Utz, concerning whom there were *no* judicial proceedings, the only forum in the District in which to vindicate her constitutional and statutory rights was the District Court. Thus, it is clear that the comity and "federalism" aspects of the *Younger* line of cases are simply inapposite to civil actions filed in the District Court before the reorganization of the judicial system in the District. Moreover, the aspects of *Younger* which are based on the traditional notion that an equity court should not enjoin pending criminal proceedings are also inapposite to this case. Appellants sought to enjoin no criminal proceedings, whether past or present or future; rather, they sought declaratory and injunctive relief with respect to administrative actions of the Metropolitan Police Department which were entirely separate from *any judicial actions which might ensue after an arrest.* Furthermore, all criminal proceedings had terminated before the District Court issued its opinion in this case. Indeed, in light of the practices followed by the Police Department, *see* 172 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 471–472, *supra post hoc* injunctive relief would probably have been necessary to obtain the return of the records from the FBI even if appellants had waited to assert their claims in any trial which might have transpired in the Court of General Sessions after the arrest records had already been sent. *See also, e. g., Sullivan* v. *Murphy,* 156 U.S.App. D.C. 28, 53, 58, 478 F.2d 938, 961, 963, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973) (*Younger* considered inapposite in injunctive action for expungement of records of mass arrests instituted after effective date of Court Reorganization Act). Finally, since this is not an action for expungement (the merits of which depend on the peculiar facts of the specific case), but an action to enjoin the practice of routinely disseminating arrest records (the merits of which depend on general principles of constituional law which apply in all preconviction situations and on construction of a local ordinance), there was no reason for the District Court to abstain in favor of action by the presiding judge of any local criminal prosecution.

Appellees also contend that the objections to pretrial dissemination of arrest records are not "ripe" for review because, "[w]hen the case came on before the lower court on cross-motions for summary judgment, the record simply did not depict any arrestee seeking to resist the pretrial transmittal of his record to the FBI." Brief for appellees at 9. *See also id.* at 10–13 & n. 1 (arguing that "arrest record relief" must depend on facts of particular case, and no relief is justified at least unless claimant affirmatively demonstrates innocence); *id.* at 18 (even though appellant Boyd asserted arrest had not culminated in disposition at time of complaint, *nolle prosequi* was ordered by time of District Court decision; claim not ripe for resolution because he could seek "arrest record relief" in local court). However, this case is clearly "ripe" for review, since "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *Lake Carriers' Assn.* v. *MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972), *quoting Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), as well as injunctive relief. Appellants claim that the routine dissemination of arrest records that do not result in convictions violates various constitutional rights and that *any* routine dissemination of arrest records and the concomitant harm is interdicted by the "Duncan Ordinance"; since these practices pose a severe threat of irreparable harm, and since there is no reasonable prospect that the FBI or the Metropolitan Police Department will take any action to alleviate this harm, appellants' complaint is surely ripe for judicial review. Moreover, since we disagree with appellees' protestations that the validity of appellants' contentions turns on the constitutional validity of their arrests, appellants' failure to claim any constitutional violations in the course of their arrests does not alter this conclusion.

Appellees' citation of *DeFunis* v. *Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) would, however, appear to indicate that appellees are actually asserting that appellants' claims are moot because their cases have been disposed of and therefore do not present a clear case of preconviction dissemination of arrest records. *See* brief for appellees at 9, 17–18. However, appellant Boyd's suit was brought before a disposition of his arrest, and he presents a classic case "capable of repetition, yet evading review." *See, e. g., Roe* v. *Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973); *Southern Pacific Terminal Co.* v. *Interstate Commerce Com.,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). More important, the legal relations between the parties will still be substantially affected by the outcome of this suit, even though criminal proceedings have been terminated. *Cf. DeFunis, supra,* 416 U.S. at 316–317, 94 S.Ct. 1704. Appellants' constitutional and

## II

In framing the constitutional question which appellants present, it is important to state with specificity what

statutory claims are essentially grounded in the contention that routine dissemination—whether preconviction or post-exoneration—is improper and results in a legally cognizable harm; in the absence of an adjudication by this court, the arrest record of appellant Bolling will remain with the FBI, and those of appellants Utz and Boyd will be transmitted to the FBI, while an adjudication in their favor will eventuate in an order to retrieve those already sent and to refrain from sending those still in the sole possession of the Metropolitan Police. Clearly, we are presented with a continuing live legal controversy affecting, if appellants are correct on the merits, substantial rights.

However, we do agree with appellees that the claim of appellant Leon M. is now moot. On October 24, 1974, the Director of the Identification and Records Division of the Metropolitan Police Department issued a memorandum to all Branch Commanders concerning the fingerprinting of juvenile arrestees:

> Effective Monday, October 21, 1974 members of this Division shall no longer prepare an FBI Fingerprint Card and FBI "Final Disposition Report" (R–84) on juvenile arrestees. This policy shall apply to all juvenile arrests, regardless of the charge, and regardless of the age of the offender.
>
> In addition, when through the course of normal operations it comes to the attention of any employee of your branch that a particular juvenile's fingerprints have been forwarded to the FBI under any previous policy of the Department and/or this Division, such information as is necessary to retrieve that material from the FBI shall be promptly delivered to the Director.

Brief for appellees Exhibit A. Appellant Leon M. does not contest appellees' assertion that, pursuant to this directive, "appellees have taken the necessary steps to recall from the FBI the fingerprint and arrest records of appellant Leon M." Brief for appellees at 27. Thus, appellant Leon M. simply has no continuing interest in the outcome of this litigation. Admittedly, there is a longstanding principle that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot." *United States* v. *W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See also, e. g., United States* v. *Concentrated Phosphate Export Assn.,* 393 U.S. 199, 202–203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Walling* v. *Helmerich & Payne, Inc.,* 323 U.S. 37, 43, 65 S.Ct. 11, 89

is and what is not involved in this case. First, appellants do not seek *expungement* of the arrest records maintained by the Metropolitan Police Department.[10]

L.Ed. 29 (1944). However, given the fact that the Metropolitan Police will be under an injunction to comply with our holding concerning adult arrest records, *see* 172 U.S.App.D.C. pp. — – —, 520 F.2d pp. 483–491 *infra,* we do not believe there "exists some cognizable danger of recurrent violation" with respect to juvenile arrest records, and since the constitutional and statutory analysis with respect to adult arrest records clearly applies *a fortiori* with respect to juvenile arrest records, "there is no reasonable expectation that the wrong will be repeated." *United States* v. *W. T. Grant Co., supra,* 345 U.S. at 633, 73 S.Ct. at 897. Moreover, should appellees return to their former practice, we are confident they would then be unable to avoid judicial sanc-

Finally, although we are troubled by the fact that appellees only plan to request the return of previously submitted juvenile arrest records if "it comes to the attention of any employee * * * that a particular juvenile's fingerprints have been forwarded to the FBI," and by the fact that Leon M. sought to have his complaint adjudicated as a class action and thereby to obtain mandatory relief for all juveniles similarly situated, the District Court did not certify this case as a class action before granting appellees' summary judgment motion. The Supreme Court has recently held that where a case is moot with respect to the named plaintiffs, and the requirements for certifying the case as a class action have not been complied with, the case must be dismissed. *Board of School Commissioners of the City of Indianapolis* v. *Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). *But cf. Sosna* v. *Iowa,* 419 U.S. 393, 397–403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (properly certified class prevents mootness even though claim of named plaintiff has become moot because of time required for litigation to run its course). Other juveniles arrested before the institution of the Identification and Records Division's new procedures are, of course, free to bring that fact to the attention of the Metropolitan Police so that their records may be reacquired from the FBI; however, there is no justification for our adjudicating their claims in the absence of a properly certified class or a named representative with an actual stake in the outcome of this litigation.

**10.** Although *Spock* v. *District of Columbia,* 283 A.2d 14, 17–18 (D.C.App.1971), held that, absent specific statutory authority, the District's local courts could not order the expunction of arrest records, this court subsequently

Since they do not contend that their arrests were constitutionally invalid, they admit that the mere maintenance of a record of that fact does not violate their right to due process or allow the Police Department to retain the tainted product of a Fourth Amendment violation.[11] Indeed, appellants recognize that there are situations in which the fact of prior arrests—even those which did not culminate in a conviction—may be legitimately employed in the criminal justice process, whether by police investigators, judicial officers, or probation or other law enforcement officials. In such situations, there are substantial procedural safeguards and significant judicial oversight which may check any potentially improper use of the information.

Second, appellants do not challenge the constitutional propriety of disseminating particular arrest records to the FBI when there is a specific law enforcement need for those data.[12] They recognize that the constitutional interests of privacy and due process which they assert must be protected may nevertheless be balanced against legitimate and weighty state interests, and that there will likely be situations in which the latter will override an individual's interest in preventing dissemination.

Finally, appellants do not suggest that the Metropolitan Police Department is prohibited from routinely disseminating more limited categories of data to the FBI. For example, routinely transmitting to the FBI the fingerprints or names (without identifying data) of individuals apprehended in this jurisdiction may subserve a legitimate state interest in that it might disclose whether the individual is a fugitive from or sought as a suspect in other jurisdictions on other crimes, and thus might facilitate a determination as to whether the individual should be held while that jurisdiction undertakes proceedings to effectuate a return of the arrestee.[13]

held that there is inherent judicial authority to order such relief when necessary to vindicate constitutional rights. *Sullivan* v. *Murphy, supra* note 9, 478 F.2d at 968–973.

In arguing that "[a]rrest record relief * * * is an extraordinary type of relief which may be granted only under compelling circumstances," and that each "arrestee must bear the burden of establishing that the facts of his case are sufficiently unique to warrant judicial intervention," brief for appellees at 10; *see also, e. g., id.* at 19, appellees rely on cases which have required such extraordinary circumstances before expunction of arrest records would be ordered. For example, expunction has been ordered when mass arrests prevented a judicial determination of probable cause, *see Sullivan* v. *Murphy, supra,* when the arrests were for the purpose of harassing civil rights workers, *United States* v. *McLeod,* 385 F.2d 734 (5th Cir. 1967), and when the arrests were for the purpose of harassing "hippies," *Hughes* v. *Rizzo,* 282 F.Supp. 881 (E.D. Pa.1968). *See generally United States* v. *Linn,* 513 F.2d 925, 927 (10th Cir. 1975) and cases cited therein. Such relief is designed to deny law enforcement officials the fruits of unconstitutional actions. However, appellees are incorrect in assuming that similar circumstances must be demonstrated to obtain limitations on the dissemination of records of constitutionally valid arrests which do not result in conviction. For although such records may have legitimate law enforcement uses, and thus should not be

needlessly destroyed, they are subject to considerable abuse if they fall into improper hands. What is therefore required is a more delicate balancing of law enforcement needs against the privacy and other interests of affected individuals, and a closer analysis of whether legitimate law enforcement needs may be served in a manner which does not unduly trench upon the individual's rights. *Cf., e. g., Shelton* v. *Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). From this perspective, it is clear that the existence *vel non* of probable cause for appellants' arrests is irrelevant to the inquiry of this case. *See, e. g., Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 724.

11. *See, e. g., United States* v. *Rosen,* 343 F.Supp. 804 (S.D.N.Y.1972) (although acquittal does not necessarily entail right to have records expunged, injunctive relief may be appropriate where records are disseminated to prospective employers.) *See generally* brief for appellants at 23–28 and sources cited therein; reply brief for appellants at 9–18 and sources cited therein.

12. *See, e. g.,* brief for appellants at 21; reply brief for appellants at n. 4.

13. *See, e. g.,* Complaint for Injunction, Declaratory Judgment and Other Appropriate Relief in *Utz* v. *Wilson,* D.D.C. Civil Action No. 45–71, at 11 (complaint filed Jan. 7, 1971); brief for appellants at 20-21.

Thus, appellants are interjecting a relatively narrow constitutional claim: that the routine preconviction or post-exoneration dissemination to the FBI of their arrest records—including not only their fingerprints, but also data identifying the person arrested and information concerning the details and surrounding circumstances of the arrest—violates their constitutional rights to due process, privacy, and the presumption of innocence, at least as long as the FBI continues to redisseminate that data for other than law enforcement—and particularly for employment and licensing—purposes.

Nevertheless, in granting summary judgment for appellees in this case, the District Court dismissed appellants' constitutional claims as "makeweight" which lacked "constitutional substantiality." This view of the merits of the constitutional contentions was apparently expressed with the District Judge's then-recent decision of *Menard* v. *Mitchell*, 328 F.Supp. 718 (1971), in mind. In *Menard,* Judge Gesell, exhibiting considerable sensitivity to the constitutional questions presented by the dissemination of information to non-federal and non-law enforcement recipients by the federal government, nevertheless refused to order the FBI to expunge Menard's arrest record. Judge Gesell believed that those constitutional questions could be avoided by construing 28 U.S.C. § 534 (1970),[14] the statute under which the FBI conducts its reciprocal exchange of criminal records, not to "authorize dissemination of arrest records to any state or local agency for purposes of employment or licensing."[15] Thus, Judge Gesell cast the constitutional question in the present case as one involving the power of the Chief of Police to disseminate arrest records to the FBI for law enforcement purposes, when the FBI might subsequently make that data available only to the District of Columbia or Federal government for employment purposes.[16] Judge Gesell found himself

> unable to see any constitutional substantiality to this contention. The period is limited. The law-enforcing needs appear to the Court to greatly transcend the inconvenience if any to individuals seeking jobs from the Federal Government while they are under indictment.

> As I have indicated in Menard, I feel that there is substantial authority for the Federal Executive Branch, through the President, as he has by appropriate Executive Orders, to take action to regulate and examine into the qualifications of individuals seeking Federal employment.

\* \* \* \* \* \*

**14.** The FBI's Computerized Criminal History files are maintained pursuant to 28 U.S.C. § 534 (1970), which provides:

(a) The Attorney General shall—
(1) acquire, collect, classify, and preserve identification, criminal identification, crime, and other records; and
(2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.
(b) The exchange of records authorized by subsection (a)(2) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies.
(c) The Attorney General may appoint officials to perform the functions authorized by this section.

An implementing federal regulation, 28 C.F.R. § 0.85 (1974) provides:

Subject to the general supervision of the Attorney General, and under the direction of the Deputy Attorney General, the Director of the Federal Bureau of Investigation shall:

\* \* \* \* \* \*

(b) Conduct the acquisition, collection, exchange, classification, and preservation of identification records, including personal fingerprints voluntarily submitted, on a mutually beneficial basis, from law enforcement and other governmental agencies, railroad police, national banks, member banks of the Federal Reserve System, FDIC-Reserve-Insured Banks, and banking institutions insured by the Federal Savings and Loan Insurance Corporation \* \* \*.

*See also* 28 C.F.R. § 20.1 *et seq.*, 40 Fed.Reg. 22114 *et seq.* (May 20, 1975).

**15.** 328 F.Supp. at 726. *See also id.* at 727.

**16.** *See* brief for appellants at Appendix B (reproducing oral opinion of District Court filed Nov. 27, 1971).

It is also clear that the concern in the complaint that indirectly through the FBI arrest record information would be disseminated to private employers in this city or elsewhere is mistaken inasmuch as the Bureau is operating consistent with the Court's observation in Menard. The Court takes judicial notice of the fact that the Bureau is not disseminating information to private employers and is taking appropriate steps, as it has in the past, to police any inappropriate action by police departments who obtain information in the name of law enforcement and who may be tempted to pass it on to private employers.[17]

Although we disagree with the District Court's pronouncement that utilization, pursuant to presidential order in the name of national security,[18] of unexpurgated arrest information by the Federal government for employment purposes raises no substantial constitutional questions, we are not faced with that comparatively limited constitutional inquiry. Rather, we note that Congress has legislatively overruled the limitations which Judge Gesell had found on the FBI's power to disseminate information outside of law enforcement channels. Although the FBI, shortly after the District Court's decision in Menard, issued a directive stating that it would comply with that decision, Congress immediately responded with Pub.L. No. 92–184, 85 Stat. 627, 642 (1971),[19] which provides that

[t]he funds provided in the Department of Justice Appropriation Act, 1972, for Salaries and Expenses, Federal Bureau of Investigation, may be used, in addition to those uses authorized thereunder, for the exchange of identification records with officials of federally chartered or insured banking institutions to promote or maintain the security of those institutions, and, if authorized by State statute and approved by the Attorney General, *to officials of State and local governments for purposes of employment and licensing,* any such exchange to be made only for the official use of any such official and subject to the same restriction with respect to dissemination as that provided for under the aforementioned Act.

The FBI, pursuant to this authorization, announced that it would resume its prior practice of disseminating arrest records to banks and state and local governments for employment and licensing purposes if permissible under state law and approved by the Attorney General. *See* Federal Bureau of Investigation, Letter to All Fingerprint Contributors, Jan. 20, 1972. Indeed, the Justice Department has now promulgated regulations [20] which provide that

---

17. *Id.* Judge Gesell also asserted that although "there may be some defendants arrested whose names go to the FBI before a probable cause hearing is held or an indictment issues," "this is a limited number in the whole circumstance and there certainly is an assumption and a proper assumption in this jurisdiction that most arrests made in this jurisdiction are made with probable cause." *Id.* However, whether or not an arrest is made with probable cause has no bearing on what restrictions should be placed on the record of that arrest to assure that it is only used for legitimate law enforcement purposes and in a manner causing the least amount of damage to a person's reputation and employment opportunities. *See, e. g., Menard* v. *Saxbe, supra* note 5 (ordering expungement of arrest record despite District Court finding that arrest was made with probable cause); notes 9, 10 *supra.*

18. *See Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 727-728. *See also* Executive Order 10450, 3 C.F.R. 57 (1974).

19. *See also, e. g.,* Pub.L. No. 92–544, 86 Stat. 1109, 1115 (1972).

20. 40 Fed.Reg. 22114 *et seq.* (May 20, 1975), 28 C.F.R. § 20.1 *et seq.,* contains the regulations recently established by the Department of Justice concerning the dissemination of criminal records by local agencies—including the Metropolitan Police Department—receiving funds from the Law Enforcement Assistance Administration, as well as dissemination by Department of Justice officials. The regulations set apparently stringent standards as to the maximum extent of dissemination and permit state and local agencies to impose even stricter self-restraints. Although the regulations may meet some of the concerns ex-

(a) Criminal history record information contained in any Department of Justice criminal history record information system will be made available:

\* \* \* \* \* \*

(3) Pursuant to Public Law 92–544 (86 Stat. 115) *for use in connection with licensing or local/state employment or for other uses* only if such dissemination is authorized by Federal or state statutes and approved by the Attorney General of the United States. When no active prosecution of the charge is known to be pending arrest data more than one year old will not be disseminated pursuant to this subsection unless accompanied by information relating to the disposition of that arrest. [21]

Moreover, as we previously noted in *Menard v. Saxbe,* 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974), which reversed Judge Gesell's decision denying Mr. Menard's attempt to have his records with the FBI expunged, the FBI does not, in fact, enforce its statutory mandate to exercise supervision and control over the propriety of the uses to which contributing agencies put the reciprocal information they receive from the FBI.[22]

■ Appellants thus contend that they are irreparably injured when their pre-conviction or post-exoneration arrest records are disseminated to the FBI for nationwide redistribution for both law enforcement and employment and licensing purposes. We agree that there is a substantial bundle of constitutional rights which may be unnecessarily infringed when such arrest records are transmitted to the FBI with the knowledge that they will be retransmitted to a multitude of organizations for a multitude of purposes, all of which are susceptible of abuse.

■ In our constitutional scheme, we operate under the salutary principle that an individual is presumed innocent of the charges of which he stands accused unless he is found guilty via a process replete with substantial procedural safeguards.[23] An arrest record, without more, is a fact which is absolutely irrelevant to the question of an individual's guilt. As the Supreme Court has cautioned:

> The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest

pressed in *Tarlton* v. *Saxbe,* 165 U.S.App.D.C. ——, 507 F.2d 1116 (1974), they nevertheless continue to allow the use of law enforcement data for employment and licensing purposes. *See, e. g.,* 28 C.F.R. §§ 20.-21(b)(2), (b)(5), (c)(3), 20.33(a)(2)–(3) (1975).

The regulations also mandate that all agencies receiving LEAA funds submit, within 180 days of May 20, 1975, a plan concerning the operational procedures of the local information systems, including the state or local agency's restrictions on dissemination. *See generally id.* § 20.21.

**21.** 28 C.F.R. § 20.33(a)(3) (1975) (emphasis added).

**22.** *Menard* v. *Saxbe, supra* note 5, 498 F.2d at 1026 & n. 28, commented on the fact that despite the mandate of 28 U.S.C. § 534(c), *see* note 14 *supra,* the FBI actually "exercises little supervision and control over contributing agency uses of the records the FBI disseminates." *See also* 498 F.2d at 1028 n. 41 (privileges of only 6 local law enforcement agencies suspended from 1924 to 1974); *Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 722.

**23.** "One of the rightful boasts of Western civilization is that the [prosecution] has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure." *Irvin* v. *Dowd,* 366 U.S. 717, 729 [81 S.Ct. 1639, 1646, 6 L.Ed.2d 751] (concurring opinion). Among these is the presumption of the defendant's innocence. *Sinclair* v. *United States,* 279 U.S. [263] at 296–297 [49 S.Ct. 268, 73 L.Ed. 692]; *Flaxer* v. *United States,* 358 U.S. [147] at 151 [79 S.Ct. 191, 3 L.Ed.2d 183].

*Deutch* v. *United States,* 367 U.S. 456, 471, 81 S.Ct. 1587, 1595, 6 L.Ed.2d 963 (1961). *See also, e. g., In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Coffin* v. *United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.")

shows nothing more than that someone probably suspected the person apprehended of an offense. When formal charges are not filed against the arrested person and he is released without trial, whatever probative force the arrest may have had is normally dissipated.

*Schware* v. *Board of Bar Examiners*, 353 U.S. 232, 241, 77 S.Ct. 752, 757, 1 L.Ed.2d 796 (1957).[24] And as one district court has eloquently observed:

Unresolved arrest records generally may well have significance for law enforcement purposes. They provide legitimate leads and questionable background information and may properly assist in resolving criminal actions. But charges resulting in acquittal clearly have no legitimate significance. Likewise, other charges which the government fails or refuses to press or which it withdraws are entitled to no greater legitimacy. They lose any tendency to show probable cause and

should not be bootstrapped into any unearned and undeserved significance. Actually, a collection of dismissed, abandoned or withdrawn arrest records are no more than gutter rumors when measured against any standards of constitutional fairness to an individual and, along with records resulting in an acquittal are not entitled to any legitimate law enforcement credibility whatsoever.[25]

Although the value of arrest records for law enforcement purposes has been generally,[26] but not invariably,[27] assumed despite the apparent conflict of this assumption with this constitutional presumption of innocence, here we are confronted with the government dissemination of arrest records in a situation in which it is known they will be utilized for employment and licensing purposes. Even if such records, as disseminated, were to include the actual disposition of the charges—and such dispositions frequently are not, in fact, included[28]—the

---

24. *See also, e. g., Davis* v. *Paul*, 6 Cir., 505 F.2d 1180, 1184 (1974), *cert. granted*, 421 U.S. 909, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1975) ("There is no rational basis to presume guilt and active criminality from the mere fact of an arrest. * * * Few things are as fundamental to our legal system as the presumption of innocence until overcome by proof of guilt beyond a reasonable doubt at a fair trial.") *Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 724 ("Under our system of criminal justice, only a conviction carries legal significance as to a person's involvement in criminal behavior.")

25. *United States* v. *Dooley*, 364 F.Supp. 75, 77 (E.D.Pa.1973). Nevertheless, the court in *Dooley* denied the petitioner's request that his arrest records be expunged since there was probable cause for the arrest and no allegation that the records were used or disseminated outside of law enforcement channels, *id.* at 77–78, and since there was no statutory authority for ordering expungement, *id.* at 79.

26. *See, e. g., Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 727; *United States* v. *Rosen, supra* note 11, 343 F.Supp. at 809; *Kolb* v. *O'Connor*, 14 Ill.App.2d 81, 142 N.E.2d 818, 821 (1957); *Fernicola* v. Keenan, 136 N.J.Eq. 9, 39 A.2d 851 (Ct.Chan.1944).

27. *See, e. g., Wheeler* v. *Goodman*, 306 F.Supp. 58, 65 (W.D.N.C.1969), *vacated on other grounds*, 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971); *United States* v. *Kalish*, 271 F.Supp. 968, 970 (D.P.R.1967); *Eddy* v. *Moore*, 5 Wash.App. 334, 487 P.2d 211, 216 (1971).

28. *See* sources cited note 22 *supra*. Even if the Justice Department were to strictly enforce its newly promulgated regulations which require that dispositions on all arrests be reported to the FBI within 120 days after the disposition has occurred, *see* note 20 *supra*, there would still be the problem of dissemination which occurs in this 120-day period, as well as the problem of dissemination until a disposition actually occurs. Moreover, although the FBI will no longer disseminate arrest records without disposition if no "active prosecution" has taken place after one year, "active prosecution" is no indication of guilt, and considerable and widespread dissemination can still take place within the year's period (or after that period if, for example, an arraignment has taken place, *see* 40 Fed.Reg. 22118 [comment on 28 C.F.R. § 20.21(c)(1)]). Moreover, once the FBI has redisseminated the arrest record data to non-law enforcement officials for employment or licensing purposes, the harm may be irreparable even if the record

government knows that a derogatory inference will often nevertheless be drawn that the person who was arrested is also guilty of the crime charged. The mere fact of an arrest may impair or cloud a person's reputation, and "[e]ven to be acquitted may damage one's good name if the community receives the verdict with a wink and chooses to remember defendant as one who ought to be convicted." *Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 222, 93 L.Ed. 168 (1948). Recent decisions by this court have acknowledged the considerable barriers that an arrest record interposes to employment, educational, and professional licensing opportunities,[29] and the regrettable fact that "so long as there exists an employable pool of persons who have not been arrested, employers will find it cheaper to make an arrest an automatic disqualification for employment";[30] available evidence suggests that "employers cannot or will not distinguish between arrests resulting in conviction and arrests which do not."[31] Indeed, appellees themselves imply that the fact of arrest should generally be taken as indicative of guilt:

There are myriad factors that may result in termination of the criminal process in a manner which in no way detracts from the proper use of the record of an arrest by law enforcement agencies. For example, witnesses may be incapacitated or unavailable, charges may be dismissed because of plea bargaining or considerations of leniency, and the government may have failed to preserve its evidence in a manner conducive to effective prosecution.[32]

 Of course, it is not inconceivable that the individual may also be absolutely innocent of any wrongdoing whatsoever.[33] The problem is that the constitutionally improper inference of guilt will be the one frequently drawn. And even if, as the government contends, all such arrest records are nevertheless useful for law enforcement purposes, that does not necessarily justify their dissemination for employment or licensing purposes. Due process obligates the government to accord an individual the opportunity to disprove potentially damaging allegations before it disseminates information that might be used to his detriment.[34] The proper forum for definitive-

---

is subsequently supplemented with a notation of its disposition. Finally, as we note below in text, even records with factually accurate notations of disposition may unconstitutionally deprive the affected individuals of job opportunities.

29. *See, e. g., Morrow v. District of Columbia, supra* note 9, 417 F.2d at 742 ("disastrous effect on a person's chances for government employment, and even for getting some city licenses and permits"); *Menard v. Mitchell,* 139 U.S.App.D.C. 113, 430 F.2d 486, 490–491 & nn. 16–24 (1970) (observing, *inter alia,* that "[o]pportunities for schooling, employment, or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges involved"); *Menard v. Saxbe, supra,* 498 F.2d at 1024 & nn. 15–19. *See also, e. g., Crow v. Kelley,* 512 F.2d 752, 754 n. 5 (8th Cir. 1975); *Wilson v. Webster,* 467 F.2d 1282, 1283–1284 (9th Cir. 1972); *Menard v. Mitchell, supra* note 9, 328 F.Supp. at 725–726; *United States v. Mackey,* 387 F.Supp. 1121, 1124–1125 (D.Nev.1975); *Bilick v. Dudley,* 356 F.Supp. 945, 950–951 (S.D.N.Y.1973); *Kowall v. United States,* 53

F.R.D. 211, 214–216 (W.D.Mich.1971); President's Commission on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 74–77 (1967); Report of the Committee to Investigate the Effect of Police Records on Employment Opportunities in the District of Columbia, *passim* (1967).

30. *Menard v. Mitchell, supra* note 29, 430 F.2d at 491 n. 24.

31. *Morrow v. District of Columbia, supra* note 9, 417 F.2d at 741.

32. Brief for appellees at 12–13. *See also Sullivan v. Murphy, supra* note 9, 478 F.2d at 969.

33. *See also Menard v. Mitchell, supra* note 29, 430 F.2d at 493–494.

34. *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."); *Joint Anti-Fascist Refugee Committee*

ly adjudicating an individual's guilt or innocence is a trial that conforms to constitutional strictures; if the government aborts that procedure or if the individual is otherwise vindicated at trial, the Constitution requires that he be treated as though he engaged in no criminal activity. For the government to disseminate an arrest record pertaining to the allegedly criminal episode, when it knows that employers may infer that the individual was guilty rather than innocent of the crime, effectively permits the government to inflict punishment despite the fact that guilt was not constitutionally established.[35] And although it would be naive to proclaim that all individuals who are not found guilty are in fact innocent of wrongdoing, many—particularly those like appellants with no prior criminal record—will fall into the category of individuals erroneously caught up in the criminal process. "[T]here is [a] limit beyond which the government may not tread in devising classifications that lump the innocent with the guilty."[36] Yet in disseminating

arrest records for use by banks and state and local governments for employment and licensing purposes, and in using them for its own employment purposes, the federal government would appear to be in effect lumping the innocent and guilty together, for all those arrested are likely to be denied opportunities open to individuals who have never run afoul of the law. "A government agency may not escape responsibility for improper use of material disseminated by it simply because the improper use is not mandatory and is in fact made by a third party".[37]

■ Whatever compelling interest the government might have in disseminating preconviction or post-exoneration arrest records for law enforcement purposes,[38] it is difficult to divine any substantive interest—whether compelling or merely rational—that the government might have in disseminating such records to private or other government employers where there is no indication that the individual is in fact guilty of criminal

v. *McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society."); *Davis* v. *Paul, supra* note 24, 505 F.2d at 1182–1183 and sources cited therein. In an analogous context, a division of this court opined that

> [T]he whole panoply of constitutional requirements, particularly the right to a speedy trial, activated upon arrest or indictment are designed to mitigate the obvious restrictions on liberty due to public accusation of a crime by the promise of an expeditious and complete hearing to determine the merits of the accusation. To permit the FBI to disseminate inaccurate criminal information without the FBI making reasonable efforts to prevent inaccuracy would be tantamount to permission to accuse individuals of criminal conduct without ever providing such individuals an opportunity to disprove that accusation. Exactly these considerations supported the Supreme Court's decision in Joint Anti-Fascist Refugee Committee v. McGrath.

*Tarlton* v. *Saxbe, supra* note 20, 507 F.2d at 1123 (footnotes omitted).

**35.** When arrest records are disseminated for law enforcement purposes, there are generally

due process safeguards that should curtail most abuse. *See, e. g., Menard* v. *Mitchell, supra* note 9, 328 F.Supp. at 727. Nevertheless, even law enforcement use of arrest records may be abusive. "[I]t is common knowledge that a man with an arrest record is much more apt to be subject to police scrutiny—the first to be questioned and the last eliminated as a suspect in an investigation." *Davidson* v. *Dill*, 503 P.2d 157, 159 (Colo. 1972). *See also, e. g., Menard* v. *Saxbe, supra* note 5, 498 F.2d at 1024; *United States* v. *Dooley, supra* note 25, 364 F.Supp. at 78.

**36.** *Menard* v. *Mitchell, supra* note 29, 430 F.2d at 492.

**37.** *Id.* at 492 n. 34; *cf., e. g., NAACP* v. *Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

**38.** Even given the likelihood that some improper dissemination would nevertheless occur as a concomitant of dissemination for strictly law enforcement purposes, limiting dissemination to situations in which a specific law enforcement need is shown will at least minimize the impermissible effects while adequately serving the government's legitimate interests. *Cf., e. g., Shelton* v. *Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

conduct yet where it is likely that the prospective employer will utilize the mere fact of arrest to disqualify the individual from employment for which he is otherwise absolutely qualified.[39] Indeed, one court, holding that a private employer's practice of denying employment to individuals with arrest records violates Title VII of the Civil Rights Act of 1964 because "any policy that disqualifies prospective employees because of having been arrested once, or more than once, discriminates in fact against [N]egro applicants," *Gregory v. Litton Systems, Inc.*, 316 F.Supp. 401, 403 (C.D. Cal.1970), *modified on other grounds and affirmed as modified*, 472 F.2d 631 (9th Cir. 1972), found as a matter of fact that

> [t]here is no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees. In fact, the evidence in the case was overwhelmingly to the contrary. Thus, information concerning a prospective employee's record of arrests without convictions, is irrelevant to his suitability or qualification for employment.

*Id.* at 402–403. If it is illegal for employers (including state and local government employers who are within the ambit of Title VII[40]) to utilize arrest records not culminating in convictions to deny an individual opportunities open to those with no such records, it would appear to be just as illegal for the government to furnish the employer with the information on which such illegal actions may be based, at least when there is no legitimate law enforcement justification for providing the employer with the data.[41]

---

**39.** It is possible that certain carefully delineated categories of information might properly be disseminated to particular types of employers—for example, to defense contractors or federally insured banks. But even if such dissemination were proper—a question we do not decide—the routine and wholesale dissemination of *all* criminal data would not appear to relate rationally to any interests purportedly served in such cases.

**40.** And if a governmental unit discriminates in employment through the utilization of arrest records, the rights it would be abridging would be constitutional rights; the private sector employer, on the other hand, is only prevented from discriminating because of congressional action. Nevertheless, where government action facilitates private discrimination, constitutional strictures should apply. *See, e. g.,* *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

**41.** Without elaborating fully on the issue since we premise our holding on statutory grounds, *see* 172 U.S.App.D.C. pp. ——-——, 520 F.2d pp. 483–491 *infra*, it would appear that there is another constitutional right which might be impaired by the dissemination of preconviction or post-exoneration arrest data for other than law enforcement purposes—the right of privacy, characterized by Justice Brandeis as the right "to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion). The Supreme Court has recognized for over eighty years the existence of at least certain zones of personal privacy which are constitutionally protected, *see generally* *Roe v. Wade*, 410 U.S. 113, 152–154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and cases cited therein; the extent of those zones and the protections which they are to be accorded must evolve with changing technology. It would seem that the right to privacy should encompass a substantial measure of freedom for the individual to choose the extent to which the government could divulge criminal information about him, at least where no conviction has ensued and no countervailing government interest is demonstrated. *See* Miller, *Personal Privacy in the Computer Age: Challenge of a New Technology in a Computer Oriented Society*, 67 Mich.L.Rev. 1091, 1107–1108 (1969). As the District Judge perceptively reflected in *Menard v. Mitchell, supra* note 9, 328 F.Supp. at 725–726:

> While conduct against the state may properly subject an individual to limitations upon his future freedom within tolerant limits, accusations not proven, charges made without adequate supporting evidence when tested by the judicial process, ancient or juvenile transgressions long since expiated by responsible conduct, should not be indiscriminately broadcast under governmental auspices. The increasing complexity of our society and technological advances which facilitate massive accumulation and ready regur-

■ However, to hold that appellees' routine dissemination of preconviction and post-exoneration arrest records to the FBI, even when supplemented by disposition notations as they occur, transgresses appellants' constitutional rights if the dissemination occurs with full knowledge that the FBI will redisseminate that information for other than law enforcement purposes, would in effect be to hold that Congress' recent statute authorizing that practice of the FBI and the Justice Department's implementing regulations are also unconstitutional. Thus, despite our severe doubts about the constitutionality of this practice, we are reluctant to base our decision on those grounds, particularly in the absence of the FBI as a party defendant and full briefing on the question from the Attorney General. However, appellants are also challenging the Metropolitan Police Department's actions on statutory grounds, and there is a well-established judicial tenet that cases should be decided on available nonconstitutional

grounds,[42] as well as a sound principle that statutes should be construed, where possible, to avoid constitutional questions.[43] Since the next section of this opinion will elaborate on the fact that the statute involved in this case—the District of Columbia's "Duncan Ordinance"—may be construed, especially against this constitutional backdrop, to avoid these substantial questions, it is on those alternative statutory grounds that we therefore base our opinion.

### III

■ On October 31, 1967, the "Duncan Ordinance,"[44] which had been drafted by the select Committee to Investigate The Effect of Police Arrest Records on Employment Opportunities in the District of Columbia, was adopted by the District of Columbia Board of Commissioners.[45] The Duncan Ordinance specifies:

gitation of farflung data have presented more problems in this area, certainly problems not contemplated by the framers of the Constitution. These developments emphasize a pressing need to preserve and to redefine aspects of the right of privacy to insure the basic freedoms guaranteed by this democracy.

\* \* \* Systematic recordation and dissemination of information about individual citizens is a form of surveillance and control which may easily inhibit freedom to speak, to work, and to move about in this land. If information available to Government is misused to publicize past incidents in the lives of its citizens the pressures for conformity will be irresistible. Initiative and individuality can be suffocated and a resulting dullness of mind and conduct will become the norm. \* \* \* In short, the overwhelming power of the Federal Government to expose must be held in proper check.

See also, e. g., Tarlton v. Saxbe, supra note 20, 507 F.2d at 1124; Morrow v. District of Columbia, supra note 9, 417 F.2d at 742; United States v. Dooley, supra note 25, 364 F.Supp. at 77–78; United States v. Kalish, 271 F.Supp. 968, 970 (D.P.R.1967). But see Tosh v. Buddies Supermarkets, Inc., 482 F.2d 329, 332 (5th Cir. 1973) (alternative holding).

42. See, e. g., Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

43. See, e. g., Palmore v. Superior Court, 169 U.S.App.D.C. 323, 515 F.2d 1294 (1975); United States v. Hairston, 161 U.S.App.D.C. 466, 495 F.2d 1046, 1052 (1974); United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333, 1337, 1341–1342 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

44. The Duncan Ordinance has been so-named for the Corporation Counsel of the District of Columbia who headed the Committee which drafted the Ordinance.

45. Although there have been two substantial overhauls in the governmental structure of the District of Columbia since adoption of the Duncan Ordinance, the Ordinance apparently has survived those changes. Reorganization Plan No. 3 of 1967, prepared by the President and effective as of November 3, 1967, abolished the Board of Commissioners and established an appointed Commissioner and City Council to which the Board of Commissioners' regulatory and other functions were transferred. See Appendix I to Title 1 of D.C.Code (1973). However, nothing in that Reorganization Plan even hinted that the ordinances or regulations adopted by the Board of Commissioners during the prior century would be abolished, and Morrow v. District of Columbia, supra note 9, and In re Alexander, 259 A.2d 592, 593 (D.C.C.A.1969) (Duncan Report rules are "now in force"), both of which were decided after the Reorganization Plan's effective

1. That no record, copy, extract, compilation or statement concerning any record relating to any juvenile offender or relating to any juvenile with respect to whom the Metropolitan Police Department retains any record or writing, shall be released to any person for any purpose except as may be provided under D.C. Code, Section 11–1586; provided, that the release of such information to members of the Metropolitan Police Department, and the dissemination of such information by the Metropolitan Police Department to the police departments of other jurisdictions wherein juveniles apprehended in the District of Columbia may re- side, shall be authorized; provided further, that the release of such information to individuals to whom the information may relate or to the parents or guardians or duly authorized attorneys of such individuals, shall be authorized in those cases in which applicants therefor present documents of apparent authenticity indicating need for such information for reasons other than employment. The term "employment", in the context of this paragraph, shall not include military service.

2. That unexpurgated adult arrest records, as provided under D.C. Code, Section 4–134a,[46] shall be re-

---

date, clearly contemplated that the Ordinance persisted with full vigor.

The District of Columbia Self-Government and Governmental Reorganization Act, Pub. L.No. 93–198, 87 Stat. 774 *et seq.* (1973), created an elected Mayor and City Council and granted partial home rule to the inhabitants of the District. But in transferring various functions from the older form of government to the newer form, the Act specifically provided that "[a]ny statute, regulation, or other action * * * shall, except to the extent modified or made inapplicable by or under authority of law, continue in effect as if such transfer had not been made[.]" Act § 714(a), 87 Stat. 819. Thus, the Duncan Ordinance, which was nowhere modified in the Act, continued as a valid statute regulating the dissemination of arrest records in the District.

Although D.C. Code § 1–1507(a) (1973), the compilation and publication provision of the District of Columbia Administrative Procedure Act, D.C. Code § 1–1501 *et seq.,* which was enacted in 1968, commands that the Commissioner compile and publish in the District of Columbia Register "all rules adopted by the Commissioner and Council and each agency and in effect at the time of such compilation," and although D.C. Code § 1–1507(c) specifies that "no rule adopted by the Commissioner or by the Council or by any agency before the date of such first publication [before Oct. 21, 1970] which has not been filed and published * * * shall be in effect after" October 21, 1970, the Duncan Ordinance was not published in the District of Columbia Register. Nevertheless, since the Duncan Ordinance was adopted by the Board of Commissioners rather than the "Commissioner and Council" which were created by Reorganization Plan No. 3, it does not appear to be covered by this provi- sion. Indeed, Act 1–30 has only recently brought such prior ordinances under the umbrella of the D.C. Administrative Procedure Act and has required that "On or before January 10, 1976, * * * the Mayor shall submit to the Council a proposed District of Columbia Municipal Code which shall contain * * * all rules adopted by * * * the Board of Commissioners which are in force as of June 30, 1975." 22 *D.C. Reg.* 633, 643–44 (July 28, 1975) (approved by the Mayor July 10, 1975; transmitted to Congress July 23, 1975). Finally, it is clear that even after the Duncan Ordinance had not been published in the District of Columbia Register and the October 21, 1970 deadline had passed, the District of Columbia Court of Appeals held that the Ordinance still governed the dissemination of arrest records in the District. *See Spock* v. *District of Columbia,* 283 A.2d 14, 19–20 (D.C.App.1971) ("To the extent that considerations of invasion of privacy, due process or equal protection affect private interest, we * * * reaffirm here that the regulations on dissemination (the Duncan Report * * *) presently in force are adequate.").

**46.** Congress has required that two sets of police records pertaining to arrests be maintained by the Metropolitan Police. D.C. Code § 4–134(4) (1973) directs that each precinct shall have a chronological record of each arrest, and D.C. Code § 4–135 (1973) renders those records "open to public inspection when not in actual use." As we noted in *Morrow* v. *District of Columbia, supra* note 9, 417 F.2d at 741–742 (footnote omitted):

[I]t would be virtually impossible to check on the arrest record of a person by using the precinct arrest books because one would have to know the approximate date and

leased to law enforcement agents upon request, without cost and without the authorization of the persons to whom such records relate and without any other prerequisite, provided that such law enforcement agents represent that such records are to be used for law enforcement purposes. The term "law enforcement agent" is limited in this context to persons having cognizance of criminal investigations or of criminal proceedings directly involving the individuals to whom the requested records relate. The term includes judges, prosecutors, defense attorneys (with respect to the records of their client defendants), police officers, Federal agents having the power of arrest, clerks of courts, penal and probation officers and the like. It does not include private detectives and investigators; personnel investigators, directors and officers; private security agents or others who do not ordinarily participate in the process involving the detection, apprehension, trial or punishment of criminal offenders.

3. That, subject to the foregoing, adult arrest records, as provided under D.C. Code, Section 4–134a, shall be released in a form which reveals only entries relating to offenses which have resulted in convictions or forfeitures of collateral.

4. That, subject to the foregoing, adult arrest records, as provided under D.C. Code, Section 4–134a, shall be released in a form which reveals only entries relating to offenses committed not more than 10 years prior to the date upon which such records are requested; except that, where an offender has been imprisoned during all or part of the preceding 10-year period, the record shall include entries relating to such earlier conviction.

5. That, subject to the foregoing, copies or extracts of adult arrest records, as provided under D.C. Code, Section 4–134a, or statements of the non-existence of such records shall be released to applicants therefor upon the payment of fees to be based upon the cost of editing and producing such copies, extracts or statements; provided, that applicants who are not the persons to whom such records may relate must, in addition to the required fees, present releases in appropriate form executed by the persons to whom the records may relate; provided further, that no fee shall be required with respect to any record solicited by any agent of the Federal or District of Columbia Government for a governmental purpose.

6. That Article 47 of the Police Regulations of the District of Columbia be amended to provide that it shall be an offense punishable by a fine not to exceed $50.00, for any person to require as a condition of employment the production of any arrest record or copy, extract or statement thereof at the expense of any employee or applicant for

place of each arrest. The requirement that arrest books be open to the public is to prevent any "secret arrests," a concept odious to a democratic society; in view of the statutory requirement that such records be public, any attempt to prohibit public inspection of the arrest books would run into substantial legal difficulties.

Thus the Duncan Report deals with the second set of arrest records maintained by the Metropolitan Police under D.C. Code § 4–134a (1973)—the "central criminal records" comprising a detailed record of the progress of the prosecution and disposition of an arrest. These files are arranged alphabetically rather than chronologically and contain a card that details the record of all arrests and their dispositions with respect to each individual arrested in the District. *See generally Morrow* v. *District of Columbia, supra,* 417 F.2d at 741–743. This is essentially the information transmitted by the Metropolitan Police to the FBI.

employment to whom such record may relate.[47]

As has been recognized in the past, the Duncan Ordinance establishes the guidelines which control the dissemination of arrest records in this jurisdiction;[48] as applied to the issue before us, it is clear that the Ordinance prohibits the practice to which appellants object.

Appellant Leon M. asserts that Section 1 of the Duncan Ordinance, which except for three narrow and explicit qualifications commands that juvenile arrest records shall not be released "to any person for any purpose," prevents the routine dissemination of such records to the FBI. Since we believe that intervening developments have mooted appellant Leon M.'s ability to challenge the Metropolitan Police Department's actions,[49] we need not address the contours of this provision or its interaction with D.C. Code § 16–2333(a) (1973).

■ Although the Duncan Ordinance appears on its face to accord adults less protection than it accords juveniles, it nevertheless prevents the routine dissemination of adult arrest records to the FBI. Section 2 of the Duncan Ordinance mandates that such records shall be released to "law enforcement officers" without any prerequisite such as paying the costs of producing and editing the records or securing authorization from the individuals to whom the records relate. However, such release is only to be made "upon request." The FBI does not request the records which it is provided

by contributing agencies; indeed, when asked whether the federal government desired to protect through intervention any interest it might have in this proceeding, the United States Attorney stated:

The United States has no interest which it seeks to protect which would require its intervention in to *Utz* v. *Wilson* * * *.

* * * [I]t is the position of the United States of America that whether the Metropolitan Police Department or any other law enforcement agency submits arrest fingerprints to the Federal Bureau of Investigation is a matter solely within the jurisdiction of the arresting agency. *Submission of such records to the Federal Bureau of Investigation is a voluntary action on the part of the law enforcement agency and the Federal Bureau of Investigation does not request the submission of such records.* * * * In short, adherence by the Metropolitan Police Department to the Duncan Ordinance is *consistent with the position of the Federal Bureau of Investigation.*[50]

Moreover, when a law enforcement official requests unexpurgated adult arrest records, the Duncan Ordinance specifies that he must "represent that such records are to be used for law enforcement purposes." However, it is clear that records disseminated to the FBI will also be used by state and local governments and federally insured banks, as well as by the federal government, for employment and licensing purposes in

47. Although the Duncan Ordinance is not officially reported, it is reproduced as an Appendix to *Morrow* v. *District of Columbia, supra* note 9, 417 F.2d at 745–746.

48. *See, e. g., id.* at 741–743; *Spock* v. *District of Columbia,* 283 A.2d 14, 19–20 (D.C.App. 1971); *In re Alexander,* 259 A.2d 592, 593 (D.C.App.1969).

49. *See* note 9, *supra.*

50. Statement of Position of the United States of America With Respect to Intervention in

*Utz* v. *Wilson,* C.A. 45–71 and Consolidation of *Utz* with *Menard* v. *Mitchell,* C.A. 39–68, in *Utz* v. *Wilson,* D.D.C. Civil Action No. 45–71 (statement filed Jan. 15, 1971). Furthermore, the "request" contemplated by the Duncan Ordinance appears to be an individualized request in each specific case with respect to an individual's records, rather than an arrangement under which a single "request" triggers routine and indiscriminate future transmittal of records to the agency seeking the data.

addition to any law enforcement purposes to which the records would be put.[51]

 Finally, even if the FBI's reciprocal data exchange program could be shoehorned into the term "request," and the representation which must be made to receive the data were interpreted only to require that *some* law enforcement use be made of the data rather than that such utilization be *exclusive,* the FBI would not be a "law enforcement agent" within the narrow definition of Section 2 of the Duncan Ordinance. That term is explicitly "limited * * * to persons having cognizance of criminal investigations or of criminal proceedings *directly involving the individuals to whom the requested records relate."* Thus, although transfer of an arrest record to the FBI would not contravene the Ordinance if that agency requested information possessed by the Metropolitan Police pertaining to individuals wanted in other jurisdictions or sought data that might be currently used in prosecutions or for sentencing recommendations, the FBI does not stand in that law enforcement role when it merely receives arrest data to store in its master "rap" sheet for *potential* use in such investigations or prosecutions, to say nothing of the employment and licensing purposes for which those records are obtained.

Absent a specific law enforcement request that would satisfy Section 2 of the Duncan Ordinance, adult arrest records may only be disseminated pursuant to Sections 3 to 5 of the Ordinance. Section 3 limits disclosure of records to those offenses which have resulted in either a conviction or a forfeiture of collateral, and even those records, according to Section 5, may only be released to applicants who "present releases in appropriate form executed by the persons to whom the records may relate." Thus, the routine and unconsented transmittal of the arrest records of all plaintiffs-appellants—including appellant Boyd, who was convicted of the crime for which he was arrested but who did not consent to dissemination of his arrest record for employment purposes—was accomplished in derogation of the apparently specific constraints of the Duncan Ordinance.

Nevertheless, despite this apparent clarity in the language of the Duncan Ordinance, the District Court held that the Ordinance did not extend to the relationship between the FBI and the Metropolitan Police Department:

The Court has examined with great care and frequently the report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia, which is the so-called Duncan report that led to the enactment of the Duncan regulation. The Court is totally satisfied that *the Duncan ordinance or Duncan regulation has as its essential and key purpose an effort to prevent the availability of arrest records locally to local private employers.*

There is next to no discussion of the continuing necessary intimate relations between the Chief of Police and the FBI in this jurisdiction; and a host of extremely important and practical questions would be raised if the literal language of the Duncan ordinance were to be taken as a prohibition against the Chief of Police communicating on arrest record matters with the FBI.

There is such a lack of cognizance of this problem, such a lack of any precision in the ordinance, and so many uncertainties created by attempting to read the ordinance in that broad fashion that the Court has concluded as a matter of law that the Duncan regulation does not have anything to do whatsoever with the relations between the Chief of Police and the FBI with respect to the dissemination of arrest records and reliance on it by the Plaintiffs is erroneous.[52]

---

**51.** *See* 172 U.S.App.D.C. pp. ————, 520 F.2d pp. 476–478 and notes 20, 22 *supra.*

**52.** *See* brief for appellants Appendix B (emphasis added).

In a similar vein, appellees assert that a "fair reading of the Duncan Ordinance will disclose that it is essentially designed to place limitations on the giving of arrest record data to specific private individuals requesting such data." [53]

We are unpersuaded by the argument that the Duncan Ordinance was not intended to have any impact whatsoever on the Metropolitan Police Department's routine transmission of unexpurgated arrest data to the FBI. The language of the Ordinance is itself clear in limiting the dissemination of unexpurgated adult arrest records to "law enforcement agents"—defined as "persons having cognizance of criminal investigations or of criminal proceedings directly involving the individuals to whom the requested records relate"—who "request" the data and who "represent that such records are to be used for law enforcement purposes." Routine dissemination to the FBI, which then acts as a "step-up transformer" [54] to redisseminate the records widely to both law enforcement agencies and public and private [55] employers, cannot be reconciled with this clear mandate.

Moreover, even if one looks to the Duncan Ordinance's scant "legislative history" in an effort to determine whether the transmission of unexpurgat-

ed arrest records to the FBI was to continue unabated, there is no indication that this practice was to be exempted from the apparently comprehensive scope of the Ordinance. To be sure, the Committee which drafted the Duncan Ordinance was acutely concerned with the abuse of those records for employment purposes. [56] However, it is also clear that the District Court is incorrect in stating that the Committee's efforts were directed solely at preventing such abuse by local private employers. Section 5 of the Ordinance, in specifying that "no fee shall be required with respect to any record solicited *by any agent of the Federal or District of Columbia Government for a governmental purpose*," indicates that such agents are subject to the other limitations of Section 5, including the necessity of obtaining approval from the individual to whom the records relate and the restriction [57] of dissemination to those records where the arrest culminated in a conviction or forfeiture of collateral. [58] Indeed, the language of the "Duncan Report" which accompanied the recommendations which eventually became the Ordinance was even more explicit that the Committee was concerned with governmental as well as private use of these records, and abuse in both employment and licensing areas. [59] Furthermore, the Committee

---

53. Brief for appellees at 24.

54. *See Menard* v. *Saxbe, supra* note 5, 498 F.2d at 1026.

55. *See* 172 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 476–478 *supra.*

56. *See generally* Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia (1967) (Duncan Report). *See also Morrow* v. *District of Columbia, supra* note 9, 417 F.2d at 731, 742; brief for appellants at 47.

57. The restrictions of Section 3 of the Duncan Ordinance are incorporated into Section 5 through the "subject to the foregoing" language.

58. The language in Section 1 which exempts the military from the term "employment" and the language of Section 2 governing the relationships between the Metropolitan Police

Department and law enforcement agencies (including "Federal agents having the power of arrest") also indicate that the Ordinance had a broader purview than that attributed to it by appellees and the District Court. Moreover, when the draftsmen of the Ordinance sought to continue a prior program of reciprocal data exchange they did so explicitly—Section 1 preserved such a practice with respect to juvenile arrest data that would facilitate the return of runaway children. *See also* Duncan Report at 23–24, *reproduced in* brief for appellees at Exhibit C (Section 1 would not "in any way affect the practice of the various police departments in the Washington Metropolitan Area of exchanging information concerning juvenile contacts made in one jurisdiction respecting persons residing in other jurisdictions.").

59. *See, e. g.,* Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia (Oct. 26, 1967) at 23 (recommendation 1 "would also prohibit the use of juve-

was cognizant of considerable testimony concerning the government's improper use of arrest records for employment and licensing purposes.[60] And although the most critical files of the Duncan Committee have apparently been misplaced by the Corporation Counsel, those which are still extant reveal a concern for governmental as well as private abuse of arrest data.[61]

---

nile records for administrative purposes (e. g., by the Department of Motor Vehicles in connection with determinations as to the propriety of issuance of learners' and operators' permits)"); id. at 24 (the "effect of recommendation 2 would be to limit the availability of raw arrest record data to police uses. It would *prevent the consideration of such raw data by Government administrative officers,* as well as by private employers.") (emphasis added); id. at 26 (although individuals must, under recommendation 5, pay the costs of obtaining permissible records, a "fee should not, however, be assessed for records which are to be used in the discharge of governmental functions, including the licensing of individuals and businesses and the employment of individuals by government agencies. The Committee is of the opinion, however, that *no record should be disclosed for other than legitimate law enforcement purposes without the prior specific consent of the affected individual.* Thus, *administrative agencies should be required to tender releases* but should not be required to pay fees.") (emphasis added).

60. *See, e. g., id.* at 10 ("District of Columbia Departments and Agencies routinely consider police records as part of the selection process in virtually all cases."); id. at 11 (although United States Civil Service Commission's Application for Federal Employment now elicits information concerning convictions and forfeitures of collateral rather than arrests, Executive Order 9835 requires a final "fitness" investigation to include consideration of police department files, and CSC defended significance of arrests not followed by convictions); id. at 13 (noting reports that "arrest records adversely affect persons in the middle Civil Service grades as well as applicants for lower-rated positions. * * * [They] have a continuing and substantial adverse effect upon employment and advancement opportunities."); id. at 14 (District of Columbia Department of Licenses and Inspections utilizes arrest records for licensing 35 categories of businesses); id. at 15 (District of Columbia Department of Occupations and Professions utilize arrest records, although it was about to start utilizing conviction records only); id. at 16 (Department of Motor Vehicles and District of Columbia Parole Board utilize arrest records); id. at 20 (in a typical week, of 3,672 requests for police records, *1482 were from federal government and 588 from District Government,* and less than half were from individuals (1048) and other agencies such as GSA and credit agencies (554)).

61. On June 24, 1975, this division issued the following order:

In the Report of the Committee to Investigate the Effect of Police Arrest Records on Employment Opportunities in the District of Columbia (October 26, 1967) (the "Duncan Report"), attached as Exhibit C to appellees' brief in this case, it is noted that "[t]he files of the Committee are preserved in the Office of the Corporation Counsel of the District of Columbia." Duncan Report at 3. Since this court takes judicial notice that these files may help illuminate the purposes of the "Duncan Ordinance" involved in this case, it is

ORDERED by this court, *sua sponte,* that Corporation Counsel produce said files for the court on or before Monday, June 30, 1975.

The Assistant Corporation Counsel then submitted "the original papers considered by the Committee * * *. I have taken the liberty of paginating these documents for the purpose of facilitating reference to them * * *." (letter of June 30, 1975). Our inspection of those documents revealed that although the Duncan Report indicated that there were at least 9 public hearings and 5 executive sessions "planning procedures and areas of investigation, discussing and evaluating the information presented to it, and formulating its report and recommendations," Duncan Report at 2, the minutes of only 7 public hearings and none of the crucial planning sessions were reflected in the documents submitted by Corporation Counsel, who now advises that he has been "unable to locate any records of the Committee other than those contained in the files previously forwarded to the Court." (letter of July 10, 1975). We believe that it is, to understate our reactions, unfortunate that a litigant who requests that we construe an otherwise clear statute not to apply to certain conduct, and who possessed the documents which could facilitate our analysis, cannot produce those documents most relevant for that analysis. At a minimum, however, it is clear that those documents which were produced indicate that the Committee was cognizant of both public and private abuses of arrest records. *See, e. g.,* Files at 87–88 ("anomalous that the Federal Government is attempting to persuade private industry to disregard arrest records, and at the same time is continuing to gather and rely upon such records in considering job applicants") (report of National Capital Area Civil Liberties Union); id. at 96 (in the first Committee meeting, one of the questions

Appellees do not contend that the Duncan Ordinance would permit direct, routine and unconsented transmission of arrest records—even those arrest records which result in convictions—to federal or state and local government agencies for employment and licensing purposes. Yet they suggest that the Ordinance was intended to permit such transmission knowingly though indirectly through the FBI. In light of the substantial constitutional questions which we would be forced to decide if the Ordinance were to be construed in this matter, we would require more evidence than is currently available to attribute that intent to the draftsmen of the Ordinance or to the members of the District's Board of Commissioners.[62]

set for investigation was whether "an initial distinction [should] be drawn between government and private employees with respect to the propriety of availability to them of information from police records"; no such distinction was drawn in final Ordinance); *id.* at 126–129 (excerpts from "Report of the President's Commission on Crime in the District of Columbia" pertaining to federal and District of Columbia government employment practices); *id.* at 229 (testimony of Director of D.C. Department of Corrections that FBI does not give out information and that only authorized investigative agencies in the District should be allowed to obtain arrest record information) (hearing of Jan. 27, 1967); *id.* at 230 (official of Chief Employment Section of D.C. Government Personnel Office testifies that it obtains FBI records of prospective employees after having individual fingerprinted); *id.* (Chairman of Committee suggests that distinction might have to be made between D.C. Government and private employer and between conviction and arrest; only the latter distinction became part of Duncan Ordinance); *id.* at 233 (testimony of Director of Personnel Investigations of U.S. Civil Service Commission concerning Civil Service use of arrest information; Civil Service obtains reports of arrests from FBI) (hearing of Feb. 1, 1967); *id.* at 234 (discussion of use by both federal and D.C. governments of arrest records); *id.* at 241 (Human Resources Commission advocating restrictions on arrest record use even within government) (hearing of Mar. 1, 1967); *id.* at 242 (Superintendent of D.C. License and Permit Division of Department of Licenses and Inspections notes over 35 categories of businesses require police clearances before licensing).

**62.** In construing the Duncan Ordinance not to permit the routine dissemination of arrest records to the FBI, we do so only because it is the official policy of the FBI to redisseminate those records to federal and state and local governments and to banking institutions for purposes of employment and licensing; such dissemination cannot be accomplished directly under the Duncan Ordinance. We do not rely on the fact that without specific authorization of the FBI, such records may also be obtained by private employers who are not officially approved recipients of those records. *Cf.*

Duncan Report at 24–25 ("The Committee recognizes that the Federal establishment cannot be bound as to the ultimate uses to which such unexpurgated records may be put. Nevertheless, the Committee is of the opinion that the limitation of such uses to the sphere of law enforcement is consistent with the national interest and with enlightened personnel policy.") Moreover, we do not hold, that the Duncan Ordinance would prohibit the routine transmission of fingerprints or names of individuals arrested to the FBI (since these would not be the type of compiled arrest records covered by D.C. Code § 4–134a and since there would be a compelling law enforcement justification for the Metropolitan Police to undertake such actions, *see* 172 U.S.App.D.C. pp. —–—— and note 46, 520 F.2d pp. 474–476 and note 46 *supra* ), or that the Duncan Ordinance would prohibit the transmission of an individual's arrest record to the FBI in response to a specific request relating to a pending criminal prosecution, even though such records might ultimately find their way into the hands of state and local government officials. *See* 172 U.S.App.D.C. pp. —–—— and note 38, 520 F.2d pp. 474–476 and note 38 *supra.* The Committee had balanced the competing interests of prospective employers in obtaining full information and the privacy interests of employees in preventing disclosure, and had concluded that restrictions on the indiscriminate utilization of arrest records were necessary. That balance was to be altered, however, when particular law enforcement needs could be shown. Nevertheless, there is no reason for the record of each individual who has a single brush with the law to be memorialized with the FBI where it can hamper him for the remainder of his life, and the Duncan Ordinance wisely refused to countenance such action.

Appellees' remaining arguments concerning the Duncan Ordinance are also unavailing. The contention that the existence of 28 U.S.C. § 534 (1970), 28 C.F.R. § 0.85 (1974), and D.C. Code § 4–119 (1973) belie any claim that "Congress does not intend the District of Columbia to participate in" the FBI's cooperative crime prevention program, *see* brief for appellees at 21–23, is irrelevant; we are dealing with the intent of the Board of Commissioners,

The District of Columbia sought to protect its own citizens through passage of the Duncan Ordinance. In light of the considerable obstacles which an arrest record poses to an individual's pursuit of happiness and enjoyment of freedom and liberty, and the particularly heavy toll which such records have had on minorities in this country and in this city,[63] such action was eminently reasonable. Of course, should the current City Council decide that "extremely important and practical questions" or any new policy considerations suggest that the literal language of the Duncan Ordinance was not or should no longer be intended to prevent the routine dissemination of arrest records to the FBI, it is free to act accordingly.[64] Indeed, since recently promulgated Justice Department regulations concerning the dissemination of criminal history records mandate that compliance plans be submitted within 180 days after the effective date of the regulations,[65] the City Council[66] will have the occasion to reevaluate the proper scope of dissemination and the proper weight to be accorded individual privacy and other constitutional interests in this jurisdiction. At least until such changes are effectuated, however, we are constrained to enforce the language of the Duncan Ordinance as we believe it was intended to be enforced.

Reversed and remanded with directions to grant summary judgment for plaintiffs-appellants Utz, Boyd, and Bolling, and to enter appropriate relief.

---

not the intent of Congress. In any event, the FBI has explicitly disclaimed any interest whatsoever in the outcome of this litigation insofar as it concerns the construction of the Duncan Ordinance. *See* 172 U.S.App.D.C. pp. ——— ———, 520 F.2d pp. 486–487 *supra*. Moreover, the assertion that "the adverse impact of arrest records on employment opportunity in the District * * * [is a consideration which is] utterly inapplicable to the District's participation in the congressionally established program which involves the FBI as a conduit in the reciprocal exchange of arrest data," brief for appellees at 24, is simply erroneous so long as the FBI follows the official policy of making those arrest records available to the federal and state and local governments for employment and licensing purposes. Furthermore, although we stated in *Morrow v. District of Columbia, supra* note 9, 417 F.2d at 743, that the Duncan rules "leave much room for interpretation," it was clear from the context that we were contemplating situations in which *greater* restrictions would be imposed than would appear to be required by the actual language of the Ordinance, not situations in which the Ordinance would be construed to lessen its protections. Finally, although deference is to be accorded an administrative construction of an agency's regulation, *see* brief for appellees at 26 and sources cited therein, "an agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *Federal Maritime Com.* v. *Seatrain Lines, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973). This is particularly true where the regulation was adopted to curb abuses by the agency which claims that its repeated actions constitute the best indication of the meaning of the regulation.

**63.** *See, e. g.,* Duncan Report at 7; sources cited notes 29–31, *supra*.

**64.** In particular, the City Council may conclude that routine dissemination to the FBI of arrest records that culminate in convictions is proper, especially since no substantial constitutional questions would be posed by such an amendment to the Duncan Ordinance.

**65.** *See* note 20 *supra*.

**66.** It should be clear that it is the City Council's obligation, and not the Metropolitan Police Department's, to establish these guidelines; at a minimum, the Metropolitan Police Department is not free to alter the Duncan Ordinance merely by submitting inconsistent regulations to the LEAA.